[No. 690.]

THE STATE OF NEVADA, RESPONDENT, v. THE CENTRAL PACIFIC RAILROAD CO., APPELLANT.

STATE TAXATION—RAILROAD SUBJECT TO.—The district court excluded the evidence offered to sustain the claim of defendant: "That the Central Pacific Railroad is a national road, constructed by the general government for the purpose of carrying into execution its powers over postal, military and commercial matters, and is therefore not subject to State taxation." *Held*, that the ruling must be sustained upon the authority of *Railroad Company* v. *Peniston* (18 Wall. 5).

ASSESSMENT, WHEN VALID.—The statute does not require a separate assessment or valuation of lands and improvements where both belong to the same owner; nor does it require the value per acre to be given. Where the land is described by its common designation or name, it is. not necessary to also give the metes and bounds.

IDEM—SUITS FOR DELINQUENT TAXES.—The rule of strict compliance with every form of law, required in cases where property is sold for taxes without a judgment, is not applicable to suits for delinquent taxes in the courts where jurisdiction has been once acquired.

OMISSION TO STATE NUMBER OF ACRES—WHEN IT DOES NOT INVALIDATE ASSESSMENT OF RAILROADS.—The omission of the assessor to state the number of acres of land assessed to a railroad company where the number of miles of the road is stated—where it is not shown that the railroad company was injured by the failure to state the number of acres—does not make the assessment void.

VALUE OF ASSESSABLE PROPERTY, HOW ASCERTAINED.—In the absence of any statute upon the subject, the assessor, in specifying the value of assessable property, must be guided by those general principles which everywhere determine the valuation of property independent of any statutory rules.

IDEM—RAILROADS.—The cash value of a railroad is measured by the amount of cash required to procure it, provided its utility is commensurate with its cost; and the amount of cash required to procure a railroad is the necessary cost of its construction.

IDEM.—Principles of valuation and taxation elaborately discussed and explained.

STATUTE REQUIRING DELINQUENT LIST DIRECTORY. — The provisions of the statute for a delinquent list are merely directory; the omissions to comply with them do not avail the defendant in a tax suit.

ATTORNEY-GENERAL AUTHORIZED TO BRING SUIT IN THE NAME OF THE STATE. — Under the provisions of the statute (2 Comp. L. 2778) the attorney-general is authorized to bring a suit for the collection of taxes due the State.

JUDGMENTS IN REM BIND STRANGERS AS WELL AS PARTIES AND PRIVIES.— Judgments in rem are binding not only upon parties and privies but also upon strangers. A judgment in rem is founded on a proceeding to determine the state or condition of the thing or subject-matter itself, and the judgment is a solemn declaration upon the status of the thing, and it ipso facto renders it what it declares it to be.

FOREIGN CORPORATION CANNOT PLEAD STATUTE OF LIMITATIONS.—A foreign corporation cannot plead the statute of limitations in a personal action.

COUNTY COMMISSIONERS CANNOT COMPROMISE TAX SUITS.—Neither the board of county commissioners nor the district attorney have any authority to make any compromise or composition with delinquent, taxpayers, or to release them from the payment of their taxes.

VALUATION OF PROPERTY—ASSESSORS NOT BOUND BY SWORN STATEMENTS.— The provisions of section 6 of the revenue act (2 Comp. L. 3130) are intended for the benefit of the State, and not for that of the tax-

payer; the assessor is not obliged to demand a sworn statement before making his assessment, and is not bound by it if delivered to him

IDEM — ASSESSORS MUST EXERCISE THEIR OWN JUDGMENTS, WHEN. — Where property is visible and open to inspection, the assessor should exercise his own judgment in the valuation, and not be governed by the opinion of the taxpayer.

CONFLICT OF EVIDENCE. — Where there is a substantial conflict of evidence, the verdict of the jury to whom the issue was submitted will not be disturbed.

APPEAL from the District Court of the Second Judicial District, Washoe County.

The facts material to the decision are fully stated in the opinion.

*T. B. McFarland,* for Appellant.

I. *The taxes sued for were never on the delinquent list, or returned as delinquent in any manner whatever.*

The whole amount of appellant's taxes for the year 1870, after the equalization of the assessment, was $14,668.06— which sum was *paid in full* and marked "paid" on the assessment-roll. They, therefore, were not delinquent and were never entered on the delinquent list. Now the authorities are all to the point that when the statute *provides for a delinquent list* no taxes can be collected that are not returned on said list, unless the legislature, by a subsequent statute, *remedies the defect.* How far the legislature has power to make valid what was invalid at the time of its occurrence is a question that does not arise in this case, for it has not undertaken to pass any such remedial statute. It might, in the first instance, have refused to provide for any delinquent list; or, probably, it might afterwards have made a law that these taxes should be collected, notwithstanding the fact that they were not returned as delinquent—*but it has not done so.* The universal rule is that the officers *must pursue the law as they find it.* (Blackwell on Tax Titles, chapter x; *Lessee of Harmon* v. *Stockwell,* 9 Ohio, 93; *Miner* v. *McLean,* 4 McLean, 138.)

The principle that the statute must regularly be pursued,

in order to render persons or property liable for taxes, is the universal rule of the courts. (Blackwell on Tax Titles, chapter x, 182, *et seq.;* Blackwell on Tax Titles, pages 62, 63, 3d edition; *Thatcher* v. *Powell,* 6 Wheaton, 125; *Spellman* v. *Curtenius,* 12 Ill. 413; *Donohoe* v. *Hartless,* 33 Mo. 335; *Jackson* v. *Morse,* 18 Johns. 442; *Tallman* v. *White,* 2 Comst. 66; *Moon* v. *Palch,* 12 Cal. 265; *Russell* v. *Mann,* 22 Cal. 132.)

II. *The taxes sued for were not assessed in the mode prescribed by statute, and for that reason the assessment is void.*

There is no special provision for a different mode of assessing railroads than prescribed by statute (2 Comp. L. 3136), and no provision at all for assessing railroads *as railroads.* The railroad is "real estate," and must be listed and described in the assessment-roll in the mode prescribed by the statute for the assessment of such property.

The description in this case is utterly insufficient. It gives neither the metes and bounds, nor the number of acres, nor the location and township where situated. To describe real estate as so many linear "miles" is preposterous. The legislature might possibly provide that a railroad should be assessed "by the mile"—but it has not done so. We must pursue the statute as we find it. We deem it unnecessary to further discuss this point, for the reason that the United States Circuit Court for this district, in the case of *Huntington et al.* v. *The Central Pacific Railroad Company,* has declared the law as we claim it to be, in an opinion the clearness and force of which we could not hope to improve.

We desire, simply, to cite on this point the following additional authorities: *Perkins* v. *Dibble,* 10 Ohio, 433; *Turney* v. *Yeoman,* 16 Ohio, 24; *Richardson* v. *State,* 5 Blackf. 51; *Lachman* v. *Clark,* 14 Cal. 131; *Kelsey* v. *Abbott,* 13 Cal. 618; *Ferris* v. *Coover,* 10 Cal. 632; Blackwell on Tax Titles, 124–5.

III. *The taxes were not assessed upon the principle of valuation prescribed by law, and therefore the assessment is void.*

The assessor, in fixing the assessable value of the road, considered and took into account the cost of the cuts, fills, tunnels, etc., which constitute the road-bed; also, the income and profits of the defendant corporation, received in its business of operating said road; also the fact that other portions of the road extend easterly and westerly outside of Washoe County and connect with other roads. But the legal mode of assessing such property is simply to take the cash value of the land considered *as land,* and the value of the superstructure, without reference to the considerations upon which the assessor in this case based his estimate. "Assessors are simply to ascertain the value of land, and of the erections and fixtures thereon, irrespective of the consideration whether the road is well or ill managed—whether it is profitable to the stockholders, or otherwise. Such property is to be appraised in the same manner as the adjacent lands of individuals, and without reference to other parts of the railway."

And while the mere *judgment* of the assessor as to the value of property cannot be questioned, provided he acts in the mode and upon the principle which the law prescribes, yet when he departs from that mode or principle he acts without authority, and the assessment is void. (*Albany & Sch. R. R. Co.* v. *Osborn,* 12 Barb. 225; *A. & W. R. R. Co.* v. *Town of Canaan,* 16 Barb. 244; *S. & M. R. Co.* v. *Morgan Co.,* 14 Ill. 163.)

But the fullest and most thorough judicial exposition of the principle contended for is contained in the opinion of the United States Circuit Court in the case of *Huntington et al.* v. *Central Pacific Railroad Company et al.,* above cited, to which we most respectfully invite the attention of the court.

IV. *The court erred in refusing instruction No. 3 asked by appellants, and giving No. 7 asked by respondent.*

The judgment of this court in the *certiorari* case, rendered

October, 1871, declaring the action of the board of equalization in reducing the assessment of appellants for 1870 void for want of jurisdiction was based on the fact, as it appeared in that case, that no statement had been made by appellants to the assessor within the time prescribed by law. But if in this case now at bar it appeared from the evidence that the statement of appellants to the assessor *was* made "in the manner and within the time prescribed by law," then the board *had* jurisdiction; and if the board did equalize and reduce the assessment, and appellants paid the full amount of the taxes so equalized, then the verdict should undoubtedly have been for appellants. The evidence was not only sufficient to base this instruction upon, but it was sufficient to prove affirmatively every issue of fact which the instruction proposed to submit to the jury. The judgment of this court in the *certiorari* case, which is relied on by respondent as an estoppel on this point, was, first, not between the same parties; and, second, upon an entirely different state of facts.

V. *This action is barred by the statute of limitations.*

The cause of action accrued in December, 1870. (Comp. Laws, volume 2, 3153.) The complaint was *not* filed until more than three years thereafter. This is "an action upon a liability created by statute," and is barred in three years. (Comp. Laws, volume 1, 1031.) It applies as well to actions brought in the name or for the benefit of the State as to those brought by private parties. (Comp. Laws, volume 1, 1034.) The only answer made to this defense in the court below was that one of the appellants, viz., the Central Pacific Railroad Company, was a non-resident, having its principal place of business in California. It is doubtful if the record shows this fact; but if it does, this case is not within the rule that stays the running of the statute against one out of the State. The reasons given by this court in *The Chollar-Potosi Mining Company* v. *Kennedy* (3 Nevada, 372) particularly apply to this action. It is essentially a proceeding *in rem.* The tax is against the *property.* The

State finds the property within her borders, and she levies a tax on it. It matters not who is its owner, and his absence from the State does not delay proceedings to enforce the tax. The statute expressly provides that when the owner is absent the summons need not be served on him at all. In such a case the summons is served by *posting it on the land;* and the district attorney merely publishes a general notice in a newspaper that suit has been commenced. (Comp. Laws, 3155.) There is no reason, therefore, why the statute should not commence running when the cause of action accrues. Moreover, a corporation having the principal part of its property and business in one State, under the charge and in the possession of its agents and officers there, is not a non-resident *with respect to that property* within the meaning of the statute simply because its chief corporate officers reside in another State. And then, the action as to the other defendants, viz., the property, is certainly barred. But if there is no longer a charge against the very *thing* upon which the tax was levied, is not that the end of the whole matter?

VI. *The court erred in refusing instructions No. 10 and 11 asked by appellants, and in refusing to admit in evidence the order of the board of commissioners made December 11, 1871.*

That order was made in pursuance of an agreement between the appellant corporation and the board, that if the former would pay a certain large sum of money to the county treasurer the latter would not authorize the district attorney to commence any suit for taxes for the years 1870 and 1871. The district attorney *consented to and advised it.* Appellant paid the money upon the sole consideration that the order should be made.

The board had full power to make the order and appellant the right to rely on its validity. The law affords no opportunity for the glaring breach of good faith now sought to be perpetrated. The statute gives to the commissioners the power to control "the prosecution or defense of all suits to which the county is a party." (Statutes 1865, page

259, subdivision 12.) This provision evidently refers to all cases where the county is a *real party in interest*, although some statutory provisions require them to be brought in a particular form by which the county does not appear as a *nominal* party. Thus all suits for taxes—whether for county or State or both—are required to be brought in the *name* of the State; but that suits for taxes, although commenced in the *name* of the State, were intended to be controlled by the commissioners clearly appears from the statute of 1871, which provides that no suits *for taxes* shall be commenced by the district attorney *except upon the order of commissioners*. (Statutes of 1871, 93, 94.) Indeed, throughout the whole framework of the revenue system, the commissioners appear as the agents of the State within their respective counties for purposes of public finance. The machinery of the county governments is the only one provided for the assessment, equalization and collection of the State taxes. It has no special officers of its own for that purpose. It receives its revenues through the action of the county officials who are its agents in all matters relating to its collection. They, of course, cannot exceed their authority; but the statute expressly gives the commissioners the power which they exercised in making the order in question.

VII. The assessor increased the valuation of the road without any evidence or taking any testimony under oath, and his act in so doing was void. (Statutes of 1869, 184.)

VIII. *The assessment was fraudulent.*

The assessor fraudulently suppressed the first statement of superintendent Towne for the purpose of getting the appellant into a trap; and the testimony of Raphael shows the malice and evil intent which moved him.

IX. The Central Pacific Railroad is a national road, constructed by the general government for the purpose of carrying into execution its powers over postal, military and commercial matters, and is therefore not subject to State taxation. The court therefore erred in excluding from the evidence the statutes of Congress and of the States of California and Nevada referred to in the answer.

On this point we respectfully refer to the printed brief of counsel for appellant on file in this court, in the case of *The State of Nevada* v. *The Central Pacific Railroad Company*, 7 Nev. 99.

*Robert M. Clarke and J. R. Kittrell, Attorney-General,* for Respondent.

I. At the time the delinquent list was made out, the sum sued for was not shown to be due, the board of equalization having reduced the valuation of the defendant's property for taxation, which action of the board was reversed by this Court in the case of *The State ex rel. Thompson* v. *The Board of Equalization of Washoe County* (7 Nev. 83), after the delinquent list was made out, and when too late to put such delinquency upon said list.

The provisions of the revenue act requiring a delinquent list—indeed, all of the provisions of said act relating to matters between the assessment and suit—are directory merely, and therefore a failure to observe them is immaterial, and cannot constitute a defense against the payment of the tax. (2 Comp. L. 3156; *State of Nevada* v. *W. U. Tel. Co.*, 4 Nev. R. 338.)

The matter relied upon is not a defense which is permitted to be made in a tax suit; it is forbidden by section thirty-two of the revenue law. (2 C. L. 3156.)

The authorities cited and read from by appellant's counsel were not in point, they being cases to determine the validity of a tax-title under a revenue system different from our own.

II. The assessment was made in pursuance of, and in strict conformity to, the statute of 1869, 184–5, and the amendments thereto of 1873, 65, 66. Independently of these statutes, however, both upon authority and reason, the assessment is valid. Not the land covered by the right of way—the fee to which is in the United States, or in the State of Nevada—is to be assessed for taxation, but the railroad as a railroad, at the actual cash value, the same as other property. (2 Comp. L. 3125; *People* v. *Fredericks*, 48 Barb. 174; *State* v. *C. P. R. R. Co.*, 7 Nev. R. 103.)

The defense is not one which is permitted by section thirty-two of the revenue act. (2 Comp. L. 3156.)

III. The only principle of valuation recognized by the revenue laws of this State is, that all property subject to taxation shall be assessed at its actual cash value. (2 Comp. L. 3125.) This principle was followed by the assessor. If any error was committed it was in assessing the defendant's property at a sum greatly below its true value. It is not the true principle, as maintained by the counsel for appellant, that the defendant's railroad shall be assessed and valued as so many acres of land, or as so many miles of iron rails and ties, but that it shall be assessed and valued as a completed and operated line of railroad. (7 Nev. 103; 48 Barb. 174.)

The defense is not one which is permitted by the thirty-second section of the revenue laws. (2 Comp. L. 3156.)

The defendant's property is not over, but is under value. The defendants, therefore, sustain no injury, and the mere method or principles of valuation which the assessor adopted are immaterial.

The case of *Huntington* v. *The C. P. R. R. Co.*, which is chiefly relied upon by appellant's counsel, is not good authority, because not supported in reason nor upheld by authority, and because upon a revenue law differing in the most substantial particulars from our own.

IV. The judgment of this Court reviewing and reversing the action of the board of equalization in reducing the assessment of appellant was conclusive, and not open to be reviewed by the *nisi prius* court. The assessor's valuation was the only one which in the theory of the law existed. (7 Nev. R. 83.)

V. The statute of limitations is not applicable, and does not bar a suit for taxes. (1 Comp. L. 1031.)

A tax is not a "liability created by statute," within the sense and meaning of the law.

The cause of action did not accrue until after the decision in *State* v. *Board of Equalization of Washoe Co.*, *supra*, and since that decision the three years had not elapsed when this suit was commenced.

The defense is not permitted under section 32 of the revenue law.

The defendant being a non-resident corporation, cannot plead the statute of limitations. (1 Comp. L. 1036; *Olcott* v. *Tioga R. R. Co.*, 20 N. Y. 210; *Robinson* v. *Imperial S. M. Co.*, 5 Nev. 44.)

The judgment in this case is against the personal defendant only.

VI. The commissioners of Washoe County had no legal power to make the compromise, and it was absolutely void. (*State* v. *C. P. R. R. Co.*, 9 Nev. 88.)

VII. It is the duty of the assessor, and not the taxpayer, to put a valuation upon property for taxation; that the statement of the taxpayer is not conclusive upon, but in aid of the assessor merely. (48 Barb. 173; 4 Nev. R. 178; Id. 344.)

The provision of the act of 1869, 184, authorizing the assessor to summon witnesses, is not mandatory. It vests in the assessor a discretion merely, which he may exercise or not at his option. The assessor, nevertheless, must exercise a judgment in valuing railroad property for taxation.

VIII. There is no evidence of fraud in the assessment. The acts relied upon do not constitute fraud in the law. No mere excessive valuation is sufficient to establish a fraud in the assessment. It must be shown that the officer acted corruptly.

The facts which are relied upon to support the defense of fraud are controverted by the testimony for the respondent. There being a conflict of evidence, the verdict of the jury and the order of the court denying a new trial should be affirmed. The defendant was not injured by the alleged fraud; and not being injured, the defense is not available. (Comp. L. 194.)

IX. Appellant's road is in no legal sense a national road; and not being so, the power of the State to levy a tax upon it is absolute. (9 Wallace, 579; 18 Wallace, 5.)

By the Court, BEATTY, J. :

This is a suit against the corporation defendant and certain parcels of real estate described in the complaint to recover an unpaid balance of taxes assessed against the corporation in Washoe County for the year 1870, and to enforce against the property the lien created by law.

The plaintiff had judgment against the corporation, which has appealed, and seeks a reversal of the judgment upon the various grounds which we shall proceed to notice.

The first defense set up in the answer is in brief: "That the Central Pacific Railroad is a national road constructed by the general government for the purpose of carrying into execution its powers over postal, military and commercial matters, and is therefore not subject to State taxation."

Evidence offered in support of this defense was excluded at the trial upon the objection that it was immaterial, the defendant excepting. The question is thus presented, whether the matter alleged is a defense to the action. It is sufficiently answered by a simple reference to the case of *Railroad Company* v. *Peniston* (18 Wallace, 5), in which the Supreme Court of the United States has decided that a corporation sustaining substantially, if not identically, the same relation to the Federal government that this defendant does, is not exempt from State taxation. We are asked by counsel for appellant to review this question upon its original merits; but we are of opinion that when the court of last resort, ordained for the protection of rights held under Federal authority against State encroachment, has decided in favor of the State, its decision should be accepted as unhesitatingly as it must have been submitted to if adverse. We have therefore not felt called upon to consider the elaborate argument of counsel upon this head. The action of the court below is sustained upon the authority of the case referred to.

Taking the points relied upon by the appellant in their natural order, the next is: "That the taxes sued for were not assessed in the mode prescribed by statute, and for that reason the assessment is void."

The total valuation of the real and personal property assessed to the defendant was $1,044,484, upon which was levied a total tax of $28,723.31. One parcel of real estate, valued at $817,500 and taxed $22,481.25, was described as follows:

"Fifty-four and one-half (54½) miles of railroad known as the Central Pacific Railroad, including land owned by the right of way, embankments, cuts, culverts, bridging, grading, ties, rails, ribs, chairs, couplings, bolts, spikes, switches, turntables, etc., commencing at the westerly boundary of Washoe County and the State of Nevada, at a point on the Truckee River known as 'Camp Twenty-four;' thence following the general course of said river through the towns of Verdi, Reno and Wadsworth to a point four and one-half miles in an easterly direction from said town of Wadsworth, at the eastern boundary of Washoe County, making the entire length of said main line of railroad from the western to the eastern boundary of Washoe County fifty-four and one-half miles, at fifteen thousand ($15,000) dollars per mile, amounting to the sum of $817,500."

The above description was entered in the second column of the assessment-roll under the heading, "Description of Property." The figures expressing the valuation were placed in the third column under the heading, "Value of Real Estate or Possessory Claim and Improvements."

The specific objections to the sufficiency of this assessment are that "it does not describe the land covered by the right of way of defendant corporation by metes and bounds, or by common designation or name, and does not state the number of acres thereof, or the value per acre, or the location or township where situated, nor does it assess the improvements separately; but on the contrary, the land and superstructures are lumped together as one thing and described as so many miles of railroad, and the said pretended assessment is therefore void on its face."

To this it may be replied that our statute does not require a separate assessment or valuation of lands and improvements where both belong to the same owner, but on the

contrary, expressly directs that both be valued together. Nor does it require the value per acre to be given. As to the description, we are of the opinion that, in point of fact, the land is very well described by its common designation or name, and, such being the case, it was not necessary, in order to comply with the statute, to give the metes and bounds also. The statute directs that one or the other of these two modes of description shall be employed, but does not require both. We are also of the opinion that the location of the property is clearly given in compliance with the statute; and, as it does not appear that the United States has ever surveyed any portion of Washoe County into townships, or (if another kind of township is meant by the statute) that Washoe County embraces more than one township, we cannot know that it was possible to give any township. So far, therefore, as these objections are concerned, they might be disposed of by saying that, in point of fact, they are without any foundation.

But the assessment is manifestly deficient in one particular. It does not give the number of acres of the land. The statute directs that the number of acres shall be given as near as can be conveniently ascertained. In view of this deficiency, it becomes necessary for us to give a broader examination to the questions presented.

Assuming, then, for the sake of the argument, that this assessment presents the various deficiencies specified, what is the consequence? It is claimed, in behalf of appellant, that the assessment is therefore absolutely void, and that it never became liable to pay the tax.

In support of this proposition a large number of cases are cited, which establish the general doctrine that to give validity to a tax-title, where no judicial proceedings intervene, every requirement of the law, whether substantial or merely formal in its character, and having the semblance of benefit to the taxpayer, ought to be strictly observed by the officers intrusted with the execution of what, in that case, is deemed a mere naked power, by the exercise of which is to be effected the involuntary alienation of an

estate. Those decisions are based upon the strict doctrines of the common law in regard to the construction of naked powers and involuntary alienations.

As was pointed out in the case of *The State* v. *W. U. Telegraph Co.* (4 Nev. 347), they have no application to cases arising under our statute. We have abandoned the system which rendered such strictness of construction appropriate and necessary. We do not commit to merely ministerial officers the power of divesting estates of delinquents by following out a certain form of procedure. When an assessment has been made, the collection of the tax is enforced by means of a suit, and the taxpayer has an opportunity of resisting payment by showing that the assessment was fraudulent or substantially unjust. He is not at the mercy of ministerial officers, but may appeal to a jury against unfairness or oppression. A rule holding officers to a rigid compliance with every form of the law was not necessary in order to insure the safety of property. The considerations upon which the decisions referred to were based, are here totally wanting. Our revenue law has therefore expressly dispensed with the strictness with which, under the other system, assessors were required to comply with its provisions. By our revenue law the assessor and other officers concerned in the collection of taxes are directed to do a great many things; some of them designed for the protection of the taxpayer and others for the advantage of the State. These directions ought to be complied with as nearly as may be in every case, and any dereliction on the part of the officer is censurable, because it is his duty to comply with the law. But the failure of the officer to perform his duty strictly does not absolve the taxpayer, unless he is injured thereby. This is the necessary construction of the express language of the revenue law. Section 32 enumerates the defenses which are allowed in a tax suit, and excludes all others. By the terms of that section the answer is required to show not only that there has been a failure to comply with the provisions of the law, but also that such failure was fraudulent, *and an injury to the person or property assessed.*

It has been doubted by this Court whether the legislature can deny to the defendant in a tax suit the right to make any defense which would have been good independent of the statute. But we have no doubt that the legislature may provide that a noncompliance with the formal requirements of the statute itself shall not be made a ground of defense. And that is precisely what it has done. In the same breath in which it has directed assessments to be made and proceedings to be conducted in a particular mode, it has warned the taxpayer that a failure to observe the exact form prescribed in assessing his property will not absolve him from the obligation to pay his taxes unless he has been injured by such failure, and then, perhaps, only to the extent that he has been injured. Now, in this case, there is no pretense that the appellant was in anywise injured by the failure of the assessor to give the number of acres of land covered by its right of way. An accurate and pertinent description of the land assessed is only necessary, so far as the owner is concerned, in order to enable him to ascertain from the assessment-roll itself that the tax charged against him has been assessed upon his land and not upon that of a stranger. If the description fulfills this requirement it is, so far as he is concerned, sufficient. The State may, for its own purposes, require the number of acres to be given in addition to a description by metes and bounds, or by common designation; and this State has done so, taking care at the same time to provide that a failure of the assessor to comply with such requirement shall not defeat the collection of the tax.

In this case, as in all cases, it was properly a question for the jury to decide, under instructions from the court, whether the description of the property was in substantial compliance with the law, and the court below properly overruled the objection that the assessment was void for the reasons we have been considering.

The case of *Huntington* v. *The Central Pacific R. R. Co.*, recently decided in the United States Circuit Court for the District of California, arose under a statute materially dif-

ferent from ours. To some extent it may be in point, and is certainly so far opposed to our conclusions; but, for reasons which will be more fully explained in another connection, we do not feel bound to follow it. In this State it has been decided in two cases (*Hale & Norcross* v. *Storey County*, and *State* v. *Real Del Monte*, 1 Nevada, 104, and 523), that assessments of mines were good where the number of acres was not given, and intimated in another case (*Wright* v. *Cradlebaugh*, 3 Nevada, 341), that the statute was not intended to apply to lots containing only a fraction of an acre. Yet, the statute does in terms apply to mines and lots in unincorporated towns as clearly as to any other species of real property, and an exception in such cases could only be justified upon the ground that the statute is directory merely, and only to be observed where the nature of the case is such as to require it for substantial purposes. In this case it is evident from the form of the assessment that no value was ascribed to the land as land. It was regarded as a mere incident to the road, which, together with the land, was valued by the mile in length, without any regard to its superficial area. The case in 16 Barbour, 244, relied on by appellant in support of another point, decides that it is not necessary, in assessing a railroad, to give the number of acres covered by it. There is a stronger reason for holding the same way in this case; for there the land was owned by the railroad company, while here it does not own the land, but only a right of way, which is valuable, not in proportion to the number of acres covered by it, but only by the number of miles that it extends in length.

Another objection involving the validity of the assessment is, that "the taxes were not assessed upon the principle of valuation prescribed by law, and therefore the assessment is void."

No principle of valuation of property for purposes of taxation is prescribed by the laws of this State. The statutes define the different species of property, and provide that every species shall be assessed at its "actual cash value." But as to the mode of ascertaining the cash value our statute

law is silent. No subsidiary principles of valuation are laid down to guide the owner in making his statement in those cases where he is required to specify values; and the assessor is left equally unrestricted in making his estimates. It follows that owners and assessors must be guided by those general principles which everywhere determine the valuation of property, independently of statutory rules. In some of the cases quoted by counsel for appellant in support of his argument on this point, the conclusions reached seem to depend, to some extent, on the wording of the laws under which the assessments were made. For instance, special significance seems to be attached to the provision of the New York statute that "the term 'full cash value' means the amount at which the property would be appraised if taken in payment of a just debt from a solvent debtor." Whether or not, as a question of sound construction, this definition introduces any new or peculiar principle of valuation, it is unnecessary to decide. We have only to remark that our statutes contain nothing similar. The Constitution of-Nevada requires that provision be made for a "just valuation," for purposes of taxation, of every species of property, and the statute has provided that all property shall be assessed at its "actual cash value." We have only to determine, therefore, what are "just" principles for ascertaining cash values, and to ascertain whether they have been violated in making this assessment. We think it will not be questioned that those only are just principles of valuation which, in their application, will result in distributing the burden of taxation in due proportion among owners of different kinds of property, which will bear with equal weight upon owners of houses, owners of quartz-mills and owners of railroads. The theory of the defendant as to the correct method of determining the value of its railroad is fully stated in the answer. It was the duty of the assessor "to appraise the land included in said right of way at its cash value per acre as land, and as of the same value as adjoining land of the same quality, and to appraise said superstructure at its cash value as ties and iron rails, con-

sidered as new or old, or depreciated in value by use, irrespective of the franchise in connection with which they were owned and used." * * * He did not "state the number of acres, nor did he appraise it at its cash value per acre, or as of the same value as adjoining land of like quality; nor did he appraise the superstructure thereon at its cash value, considered as ties and iron rails, as new or old, or depreciated in value by use; on the contrary, said assessor in assessing, and the board of equalization of said county in equalizing, were not governed by the cash value of the land, * * * nor by the value of the ties and iron rails, * * * nor by the value of the bridges and trestles, as such respectively; but on the contrary, they considered said right of way and superstructure as constituting one thing, and ascertained their value by taking into account the franchise of said defendant corporation and its value, the cost of construction, fills, embankments, tunnels and cuts, and the fact that said railroad and telegraph line was a part only of a line extending from San José to Ogden, as aforesaid, and there connected with a line of railroads extending thence to the Atlantic Ocean; and the amount of business transacted over said entire road, and the profits derived therefrom; all of which, as said defendants aver, was contrary to the rules prescribed by the aforesaid laws of said State."

These quotations from the answer clearly set forth the defendant's theory. A portion of a railroad, for the purpose of valuation, must be divided, by a process of mental abstraction, into two things: First. The land to be estimated precisely at the same rate as adjoining land of the same natural quality, without any regard to the necessary cost of adapting it to a valuable use by the construction of its embankments, tunnels, cuts, fills, etc.; and, second, the ties and rails to be estimated at the value of so much old lumber and iron, without any regard to the necessary cost of building those together into a track for the passage of trains. No attention whatever must be paid to the business and profits of the road, present or prospective, nor, of

course, to the circumstances upon which these depend—
that is, the relations of the road to other lines connecting or
competing, operating or in course of construction.  Be-
sides the land, considered merely as land unimproved and
unadapted, nothing is to be taken into the account except
the movable material entering into the construction of the
track, and that is to be considered as old lumber and iron
merely.   A road which does not pay running expenses is to
be valued at precisely the same rate as one that pays a large
interest, over and above current expenses, including re-
pairs, upon all the capital invested in its construction and
equipment.

To be quite consistent with itself this theory should go
a step further.   If the value of a railroad is to be estimated
without any reference to its utility as such, then the land
should be valued at something less than adjoining land of
the same natural quality, on account of the cuts, fills, etc.,
by which it is disfigured and damaged for all other pur-
poses; and the ties and rails should be estimated at the
market price of old and deteriorated lumber and iron less
the cost of taking the track to pieces and getting the material
to market.   But taking the theory as it is stated, how will it
apply to other species of property?   Upon precisely the same
principles the value of a house should be estimated by adding
together the values of the lumber, nails, glass, brick, lime,
paint and other marketable materials that enter into its
construction, allowing nothing for the value of the skilled
labor by which these materials have been combined into a
structure, useful and beautiful, but deducting the deprecia-
tion of their market value on account of the use they have
been put to.   As its value must be ascertained without ref-
erence to its utility, a house which yields a large net income
on the entire cost of its construction must be assessed at
precisely the same amount as a similarly constructed house,
containing materials of the same value, standing in some
deserted mining camp where it can never be expected to
have a tenant, and is of no use except to be torn down and
sold as old and damaged material.   If these are not just

principles, when applied to the valuation of houses, they are not just when applied to the valuation of railroads; and if houses are in fact valued on totally different principles, it is not just to the owners of houses, and is opposed no less to the letter than the spirit of the Constitution to adopt the theory contended for in the valuation of railroads.

What do men take into account in estimating the value of a house, considered as distinct from that of the land upon which it stands? Certainly they take into account not only the value of the materials, but also that of the labor, skilled and otherwise, necessarily employed in its construction, and the interest on the capital invested during the time it was necessarily idle. Having thus ascertained its proper cost, they next consider the question of its utility, and all the circumstances upon which that depends. These include its situation with respect to business, the present condition and probable future changes of the surrounding country, and numerous other matters wholly extrinsic. If, upon the whole, it appears that as an investment it will yield an adequate return in rents or otherwise, they will be willing to give for it as much as it would cost to build another as useful, and no more. If, on the contrary, it appears that where the house stands it will never have a tenant, and that its only value consists in that of the materials that may be taken out of it, a purchaser, so far from estimating it at the value of all the labor and materials that have gone into it, will allow nothing for the labor, nothing for the material useless for removal, and nothing for interest. From the value of the movable material, he will deduct the cost of taking the structure to pieces and getting the material to market. Thus it appears that one house might be salable at a hundred thousand dollars, over and above the value of the land upon which it stands, while another containing the same materials in the same state of repair, might not sell for one thousand, and this difference in their *cash value* would result directly from those considerations which, in the case of a railroad, must be held of no account. Suppose two quartz-mills built of materials exactly similar, of the

same capacity and in perfect repair. One is so situated with reference to a productive mine, that it is certain to have a full supply of rock to crush for an indefinite period; the other has been built in connection with a mine which· has permanently given out and cannot be expected to receive a pound of rock as long as it stands. On the theory of the appellant, these two mills are of the same value. But if the "cash value" of an article is measured by the amount of cash into which it can be converted, experience has amply demonstrated in this State that they are of extremely different value, and no man, with or without experience, is at a loss to account for the difference. It results from considerations extrinsic to the mills themselves, their different situations with respect to another branch of mining industry, another and distinct species of property. But untenable as the theory appears in the light of these illustrations, it cannot be denied that it is to some extent sustained by the decisions of other courts. The first case to which we are cited is reported in 12 Barbour, 225. There the facts were agreed upon, and it appeared that the total length of the road in question was seventeen miles; that ten miles of its length was included in the town of Watervliet; that the town assessors placed upon the ten miles in their jurisdiction a valuation of two hundred and fifty thousand dollars, when in fact it was not worth more than sixty thousand dollars, and that they arrived at this result by estimating the entire worth of the whole road, considering the lucrativeness and income thereof, and taking ten-seventeenths of that amount. The court decided very properly that this was a wrong principle of valuation. It was conceded that property worth no more than sixty thousand dollars had been assessed at two hundred and fifty thousand dollars. So gross an error in the result could scarcely have occurred without the adoption of some erroneous principle of valuation, and the agreed case clearly discloses what that was. The assessors took ten-seventeenths of the value of the entire road. There could be no hesitation in deciding that this method was incorrect. One mile of a road may embrace land worth

a thousand dollars an acre; another mile, land not worth one dollar an acre. One mile may include a bridge worth tens of thousands; the next mile, on either side, may consist of a track laid on the natural surface of the ground at the minimum cost of construction. Such inequalities are not only possible, but common, and it would rarely happen that any one mile of a road could be selected that had cost, for land and grading and superstructure, precisely the average cost per mile of the whole road. If, therefore, the value of a road has any necessary relation to its cost, as we shall endeavor to show, the course pursued by the assessors in this case was almost certain to result in an erroneous valuation, and the facts stated show that it did so result. The Supreme Court of New York, however, did not base its decision upon the reasons here suggested, but upon the ground that the assessors should not have considered whether the road was profitable or otherwise. They do not hold that the cost of the road should not have been taken into account, and only hold the assessment void as to the excessive valuation—that is, the valuation in excess of sixty thousand dollars.

In the next case to which our attention has been called, 16 Barbour, 244, there was a motion to dissolve an injunction against the tax collector which had been granted on the bill. The allegations were that nine miles of railroad worth no more than fifty thousand dollars had been assessed at three hundred thousand dollars, by taking its *cost* and estimating its *income and productiveness;* that another road of the same length alongside, with similar superstructures, had been valued at only forty thousand dollars, *because it was not a paying road.* The motion to dissolve the injunction was based upon affidavits which were really evasive. But the court held that they did fully deny the allegations of the bill, and upon that ground dissolved the injunction, allowing the tax collector to proceed with the collection of the taxes. In the course of their opinion, however, they took occasion to declare what their views would have been if the case had been different, that is, if the allegations of

the complaint had not been denied. They approved the decision last referred to, quoting its language, and went further, intimating that the cost of construction must not be taken into account as an element of value. Naturally, also, since they did not regard utility as an element of value, they expressed profound astonishment that one road should be valued at three hundred thousand dollars, and another of the same length, etc., at forty thousand dollars by the same assessors.

The next case cited by appellant is reported in 14 Illinois, 163. It is clearly against the doctrine in support of which it is appealed to. There the road was fifty-five miles long, and twenty-seven miles of its length were included in Morgan County. The assessors of Morgan County took twenty-seven fifty-fifths of the value of the whole road as the value of the twenty-seven miles in their own county. The court say: "Instead of valuing and assessing the twenty-seven miles of road which is situated in Morgan County, an undivided portion of the whole road was assessed and taxed. The valuation should have been of, and the assessment upon, that portion of the road which was situated in Morgan County. We cannot know, nor is it even probable, that each mile, or portion of the road, was of equal value. It is not probable that each portion of the road *was equally profitable or productive.* One portion of the road may be badly constructed, another well constructed. One portion may have heavy grades and curves, and another portion be level and straight. In some places the land occupied by the road may be very valuable, while in other places it may be nearly valueless. *All of these considerations, as well as the connection with the whole, must be taken into account in ascertaining the value of any given portion of the road.*" It is scarcely necessary to point out how completely the whole of this reasoning, and more particularly the portion italicized, is opposed to the appellant's theory. It is held that cost of construction and utility are elements of value, and that the connections and productiveness of a portion of a road must be taken into account in estimating its value. But the case

most strongly relied on by appellant is the case of *Huntington* v. *The Central Pacific Railroad Co.* above referred to. The plaintiff in that case was a stockholder of the Central Pacific Railroad Co., and filed his bill for an injunction against the corporation and the tax collectors of several counties of California to enjoin the payment of its taxes and the sale of the road for their non-payment. The allegations of the bill, so far as this and the preceding point are concerned, were precisely those of the answer in this case, and the application for the injunction was heard upon the bill alone. The court held that the mode and principle of valuation were incorrect, and for that, among other reasons, declared the assessment void. The judges, in their opinion, after quoting from the two New York cases above referred to, and citing the Illinois case, go on to remark: "That is to say, the property in each county must be assessed in that county, without reference to property in any other county; and the value must be estimated at the amount at which that particular land and improvements thereon would be appraised, etc., if taken by itself out of its connections." Further on they say: "On the hypothesis alleged, many elements were considered which the statute does not contemplate. In addition to other improper elements considered, such an assessment would be equivalent to taking the valuation of an undivided part of the whole road, extending entirely across two States and part of a Territory, in principle like the case in 14 Illinois. It would be taking into consideration value given to it by its connection with other property outside of the said counties; * * * or, in other words, assessing the entire road * * * and then taking a proportionate part of the whole corresponding to the number of miles of road situated in the particular county where the assessment is made." Upon another point we have felt obliged to dissent from the conclusions reached in this case; and in this connection we will state our reasons for not regarding it as authority. The court did not reason out their conclusions from any admitted premises, but based them solely upon the authority of the cases above re-

ferred to, and some others less in point and less relied on. Their attention was not called to the fact that the two decisions of the Supreme Court of New York had been overruled by a later and fully reasoned opinion of the same court (48 Barbour, 173), and they seem to have singularly mistaken and misapplied the doctrine of the Illinois case. In the case before them, there was no allegation that the California assessors had valued the portions of road in their respective counties by multiplying the number of miles in each by the average value per mile of the whole road, while in the Illinois case that fact distinctly appeared. But the court *inferred* that the action of the California assessors was equivalent to the course condemned in Illinois, merely because they took into account the considerations which the Illinois court say do affect the value of any particular portion of the road—that is, its cost, its connections and productiveness. It is surprising that the fallacy of this assumption escaped the notice of the court, when in another portion of their opinion they proceeded to comment upon the singular fact that the valuation of the road per mile in the different counties, as equalized by the State board of equalization, differed very greatly, being three times as great in some counties as in others, a result which could not possibly have occurred if the principle of valuation had · been practically equivalent to taking the average value of the whole road. Considering these various decisions, we think the question involved is, to say the least, fairly an open one. Its great practical importance will excuse a somewhat lengthy discussion.

The simple criterion of the cash value of any article of merchandise, both in law and political economy, is its current market price. But in the case of articles which, from their peculiar character or situation, have not been the subject of exchange, and which for that reason have no market price, there is no such simple rule of valuation. From the nature of the case there cannot be, unless actual cost be taken as the invariable and arbitrary standard. There is a natural and just presumption, speaking generally, that any

article is worth what it costs to get it, whether it be purchased in open market, or be something *sui generis*, manufactured to order for the one person in the world that finds occasion to use it; for, generally speaking, no man will either purchase an article or procure it to be manufactured unless it possesses, or is believed to possess, a degree of utility commensurate with its cost. Accordingly it has been held in some cases that the value of an article which has no market price, is measured by its cost. But since experience has shown that the cost of many articles is greatly in excess of their utility, the adoption of so compendious a rule would in many cases work great injustice, whether resorted to for purposes of taxation, or of compensation for private injuries. Courts have accordingly endeavored, with more or less success, to apply the general principles of political economy to the circumstances of each particular case as it has arisen. Political economy—the science of exchangeable values—has not only demonstrated the correctness of the legal standard of value in the case of articles of merchandise, but it has also settled the true relations of values in general to the utility and cost of production of the various products of human industry. Ordinary market prices are correct measures of value because they are regulated by the utility and cost of production of the articles bought and sold. They are never materially in excess of the cost of production, because, in the absence of monopoly, the competition of producers brings prices down to the equivalent of the labor, material and interest on invested capital employed in the manufacture. They do not remain below the cost of production, because, when any article is superseded by a less costly one of equal or greater utility, its production ceases. Or if, on account of financial panic, or injudicious overproduction, the price of any article falls temporarily below cost, its production is suspended or diminished till its price is restored to the proper standard. Finally, prices are never in excess of the utility of the articles bought and sold, and are often comparatively trifling. To state the principle in general terms it amounts to this:

any article will sell for its cost if it possesses a correspond-ing utility, and competition will keep the price down to cost, no matter how great may be its utility. This relation of value to cost of production and utility, which is illus-trated by market prices, is constant. It is as true in the case of a railroad, which has no market price, as it is in the case of iron rails, which are bought and sold a thousand times a day. The cash value of a railroad, like that of a bar of iron, is measured by the amount of cash required to procure it, provided its utility is commensurate with its cost; and the amount of cash required to procure a railroad is the necessary cost of its construction; by which is to be understood, not what it may actually have cost if unskill-fully laid out or extravagantly managed or constructed, but what, at the date of the valuation, it would necessarily cost to replace it with another just as good and as well adapted to the use for which it was designed. Presuming, as we may, that a railroad will not be built unless there are good reasons to believe that its utility will be equal to its neces-sary cost, and that its construction will not be made to cost more than is necessary, a railroad is *prima facie* worth its actual cost, making due allowance for the necessary dete-rioration or destruction of material by use.

To determine the value of a railroad, then, the very first inquiry is as to its actual cost. That, *prima facie*, is its value. But if it appears that the actual cost was in excess of the necessary cost, the necessary cost is the proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired by compe-tition or other cause, or, in short, if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone. If the road does not pay current expenses, and cannot be expected to do so, then it is worth no more than the value of its movable material, less the cost of taking it up and getting it to market. But if, on the contrary, its business,

present and prospective, is such as to yield a net income for an indefinite period equal to interest at current rates on its necessary cost, and that of its rolling-stock, then its "cash value" is equal to its necessary cost, less damage to material; and for that amount, at least, it must be presumed it would sell if offered for sale. It might, indeed, if the road was extremely profitable, sell for much more than its necessary cost; but in that case any amount bid in excess of cost would be allowed, not for the road itself, but for its franchise, or monopoly, or something of the sort, with a value distinct from that of the road. It would therefore be acting upon erroneous principles of valuation to *add anything* to the necessary cost of a road on account of its business or profits or franchises; and if in this case the assessor had done so, the appellant would have had just ground of complaint. But it is nowhere alleged in the answer that the road was assessed above its necessary cost, or that its cost was greater than its utility, and there is nothing equivalent to such an allegation. It is true that in a separate defense it is alleged that the road was assessed above its *value*, but that means only that it was assessed above its value according to the defendant's theory, which takes into account only the naked unimproved land and the ties and rails considered as old lumber and iron—a theory which is wholly inadmissible. In that part of the answer which sets up the separate defense under discussion, it is only alleged that the cost of construction, business and profits, connections and franchises of the road were *considered* in estimating its value. Taking these allegations for true, they do not make out a defense. They do not show that the corporation defendant was at all prejudiced by the consideration given to these things by the assessor, because they do not show that he added anything to the true value of the road on account of the separate value of its franchise, or the profits of its business. And nothing is alleged to have been considered in estimating the value of the road (except the value of its franchise) that ought not to have been considered in determining whether it was worth its cost. As to the franchise,

there is no evidence that either its terms, or its separate value, were considered at all. The testimony shows only that the portion of the road in Washoe County was considered as having a continuation east and west, and that the cost of the cuts, fills, tunnels, etc., and the income and profits of the road, entered into the estimate. In our opinion, they were correctly taken into the account. And even if we thought otherwise, we are not prepared to hold, under our statute, that an assessment based upon wrong principles of valuation is void, unless it is actually too high. Whichever way the answer may be construed, it does not allege that the assessment was too high. If the separate defenses are considered without any reference to each other, there is no allegation in this defense that the valuation was too high; and if they are considered together, the allegation of excessive valuation in one place is qualified by the theory stated in another that the value of the road is only composed of the value of the naked land, and the old lumber and iron in the track, which we cannot admit. The testimony offered on the trial did not mend the case made by the answer, but fell decidedly short of it.

There is one point further to be noticed in this connection to prevent a possible misconstruction of our opinion. It is alleged that in estimating the value of the portion of the road in Washoe County the assessor took into account the amount of business transacted over said entire road; which may mean that he took into account the through business, to which every portion of the road is essential, or that he took into account the through business of the road, and also the local business of all portions of it, with much of which the portion in Washoe County has no connection. We do not wish to be understood that the value of one portion of a road is affected by the local business of other portions. It is affected by the profits of through traffic because it is essential to the through traffic, and of course by its own local traffic. A case might happen where the local traffic of the two ends of a road would be so large as to make the whole road very profitable, while the through traffic would

be so inconsiderable that a section connecting the two ends would not be worth keeping in repair. In such a case the ends would be worth their necessary cost and the middle section would not, and to estimate it at its cost in consideration of the profits of the local business of the ends of the road would be erroneous. But even in such a case it might happen that the evidence as to the cost and business of the portion of the road in question would be of such a character that the aggregate business and profits of the road would have to be considered for purposes of estimation or comparison in order to determine the proper relation of cost and profits of the particular portion. For such a purpose it would not be improper, if necessary, to consider the aggregate amounts, any more than it would be improper, in order to determine the net profits, to take into consideration the gross profits of a business. The answer here, construing it most strongly against the defendant, does not show that the local business of other portions of the road was considered in making this assessment; nor if it did, does it appear that the portion of the road in Washoe County has less than the average amount of the whole business of the road in proportion to its cost. It was not framed to meet the kind of a case supposed, and no testimony was introduced to make out such a case.

In support of our views, as to the true principles of valuation of railroads, we refer to *People* v. *Fredericks* (48 Barb. 173), and the language of this Court in *The State* v. *The C. P. R. R. Co.* (7 Nev. 103).

Another error assigned by the appellant is, that the taxes sued for were never on "the delinquent list, or returned as delinquent, in any manner whatever."

The facts in regard to this point are, that the board of equalization reduced the original assessment by about one-half — in round numbers, from twenty-eight to fourteen thousand dollars—and the tax so reduced was paid before it became delinquent. After the time for making the delinquent list had expired, this Court, in a proceeding instituted for that purpose, annulled the order of the board

reducing the assessment upon the ground that they had acted without jurisdiction, and this suit was instituted to recover the unpaid balance of taxes due on the original assessment. The appellant insists that for two reasons the State cannot recover: First. There was no right of action; and, second, if there was a right of action there was no authority to institute the suit conferred upon the district attorney of Washoe County.

The authorities cited in support of the first point are totally inapplicable for the reasons fully stated in that part of this opinion relating to the second assignment of error. The provisions for a delinquent list are merely directory. The omission to comply with them does not avail the defendant in a tax suit. This specific point was decided in the case of *The State* v. *W. U. Telegraph Co.* (4 Nevada, 338), and the argument of the appellant fully answered. We adhere to the views there expressed. In regard to the second point, we think the statute does not authorize the district attorney to commence suit for any taxes except those which are entered on the delinquent list and advertised in the manner prescribed by the revenue act; and if this action had been commenced by the district attorney alone, without any authority except that conferred by the law, it would have become necessary for us to decide to what extent and in what manner the defendant could have availed itself of the objection to his want of authority. But so far as this case is concerned that question may be waived. The complaint in this case is not only signed by the district attorney of Washoe, but also by L. A. Buckner, attorney-general. Under the provisions of section 2778 of the Compiled Laws the attorney-general is authorized to commence an action in the name of the State in any court of the State, whenever in his opinion it is necessary to do so in order to protect or secure the public interests. If, therefore, the State has a right of action, the suit was properly brought by the attorney-general; and the fact that the complaint was signed by the district attorney of Washoe does no harm if it does no good. That the State has a right of action for taxes not de-

clared delinquent or entered on the assessment-roll is settled by the case referred to (4 Nev. 338).

The next error assigned is the giving by the district court of an instruction asked by the plaintiff as follows: "The jury are further instructed that the judgment of the Supreme Court of the State of Nevada reversing, setting aside and annulling the action and order of the commissioners of Washoe County, equalizing and reducing the assessment valuation of the defendant's property for taxation for the year 1870, is final and conclusive, and cannot be disregarded in this action." And the refusal to give an instruction asked by the defendant as follows: "If the defendant made a statement of its property to the county assessor in the year 1870 in the manner and within the time prescribed by law, as alleged in the answer, then the board of equalization had jurisdiction to equalize the assessment of defendant's said property; and if the said board did equalize and reduce said value, and defendant paid its taxes in full upon such equalized value, in the year 1870 or before the commencement of this action, then your verdict should be for the defendant." The position of the appellant in regard to this point is, that, as it was not a party to the proceeding by *certiorari*, in which this Court annulled the action of the board of equalization reducing its assessment, it is not bound by the judgment. The ground upon which that judgment rested was the fact, proved in that case, that the railroad company had refused or neglected to furnish to the assessor the statement of its property required by law, thereby depriving itself of the right to appeal to the board of equalization, and depriving the board of the right to act. But in the trial of this case the defendant offered evidence to prove that it had really furnished the statement, which, in the *certiorari* proceeding, was found not to have been furnished, and it claims that the question should have been left to the jury whether their assessment had not in fact been reduced by a board having jurisdiction to do so. Whether this was allowable or not depends upon the effect of the judgment of this Court in the previous case. If the defend-

ant was concluded by that judgment, the point was *res judicata;* if it was not so concluded, then its instruction should have been allowed and that asked by the State refused. Judgments *in personam* are binding only upon parties and privies, but judgments *in rem* are binding not only upon parties and privies but also upon strangers.

"A judgment *in rem* is an adjudication pronounced upon the *status* of some particular subject-matter by a tribunal having competent authority for that purpose. It differs from a judgment *in personam* in this, that the latter judgment is, in form as well as substance, between the parties claiming the right; that it is so *inter partes* appears by the record itself. It is binding upon the parties appearing to be such by the record, and those claiming under or by them. A judgment *in rem* is founded on a proceeding not as against the person as such, but against the thing or subject-matter itself whose state or condition is to be determined. It is a proceeding to determine the state or condition of the thing itself, and the judgment is a solemn declaration upon the *status* of the thing, and it *ipso facto* renders it what it declares it to be." (Herman's Law of Estoppel, Sec. 105.) The judgment of this Court in the case of *Thompson* v. *Commissioners of Washoe* (7 Nev. 83), annulled and declared void the action and order of the board to which the instructions refer. If it had any operation or effect, it was to make the order *ipso facto*, as to all the world, what it declared it to be. We think it did have that effect, and that the rulings of the district court were correct.

The next point made by the appellant is, that the action is barred by the statute of limitations. The argument is, that the cause of action accrued in 1870. The complaint was not filed till more than three years thereafter. The action is upon "a liability created by statute," and is barred in three years. (Compiled Laws, Vol. 1, Sec. 1031.) Various answers are made to this by the respondent, to only one of which do we deem it necessary to allude, as it is, in our opinion, conclusive. The defendant is a foreign corpo-

ration, having its principal place of business in California, and is therefore not entitled to plead the statute of limitations. This point was decided after elaborate argument in a case on all fours with this. (*Robinson* v. *Imperial S. M. Co.*, 5 Nev. 44.) We see no reason to hold otherwise in this case. It is not like the earlier case of the *Chollar-Potosi Co.* v. *Kennedy* (3 Nev. 372), and if it was, the language used by the Chief Justice in giving his opinion in that case was not assented to by his associates, and the doctrine it embodied was expressly repudiated in the later case. The opinion was expressed by the Chief Justice in the *Chollar-Potosi* v. *Kennedy*, that the statute of limitations would run against a right to recover real property, notwithstanding the absence of the defendant, because his absence did not impair the remedy. But that reason does not apply to a tax suit, in which the State has the right to recover a personal judgment against the delinquent, as well as to enforce a lien against his real estate, if he has any. In this case the judgment is against the corporation defendant alone.

On the trial of this case in the court below, the defendant offered in evidence an order made by the commissioners of Washoe County, December 11, 1871, as follows: "Whereas a controversy has heretofore existed and still exists between the Central Pacific Railroad Company on the one hand, and the State of Nevada and County of Washoe on the other hand, in relation to certain taxes levied against the property of said railroad company, situate in said county, for the years 1869, 1870 and 1871, and much litigation has already been had on the part of said State and county in endeavoring to collect said taxes, and still more litigation must be had for that purpose, of the success of which grave doubts are entertained; and whereas said railroad company have proposed a settlement of all pending and anticipated controversies in relation to said taxes, and to that end have agreed to pay into the treasury of said county, and have already done so, the sum of twenty thousand dollars, together with the further sum of two thousand dollars for the

payment of certain costs, having accrued from said litigation, and the further sum of three hundred and fifty-five dollars school-tax   *   *   *   in full satisfaction of all taxes assessed against them for property situated in said county for the three and each of the three years aforesaid; and whereas the board having considered and being fully advised in the premises, are of the opinion that the settlement so as aforesaid proposed, is to the benefit and advantage of said State and county; now, therefore, it is ordered that said sum of twenty thousand dollars, and said sum of two thousand dollars, and the further sum of three hundred and fifty-five dollars is, and the same is hereby received in full satisfaction of all taxes which have been levied upon the property of said railroad company, situated in this county, for the years 1869, 1870 and 1871, and that said railroad company be and they hereby are released from all liability for said taxes or any part thereof.   And it is further ordered that the treasurer of said county do give to said railroad company a receipt in full for all of said taxes for each of said years, and that the district attorney of said county do dismiss and discontinue all suits and proceedings now pending against said company for the recovery of said taxes, or any part thereof, at the cost of this county, and that he be and hereby is instructed not to institute any further action or proceedings, or cause the same to be done, for the recovery of said taxes or any part thereof."

In the same connection counsel for the defendant offered to prove that the money mentioned in the order was actually paid by the defendant on the express consideration that the board should make an order prohibiting any future suit for the taxes sued for in this action; that the district attorney advised and consented to such order, and agreed that no such action should be commenced, without which order and agreement no part of the money would have been paid.

The admission of the order in evidence was objected to on the ground that it was immaterial, and the objection was sustained, defendant excepting.   Defendant was allowed to prove that the sum of twenty-two thousand three hundred

and fifty-five dollars was actually paid to settle all controversies in regard to the taxes of 1869, 1870 and 1871, and upon condition that a pending suit should be dismissed, and no action begun in the future; that a receipt in full was given for the taxes of 1869, 1870 and 1871; that the agent who made the payment acted upon the belief that the board of commissioners had the power to make the arrangement, and that otherwise no payment would have been made. The plaintiff, in rebuttal, proved that in the suit for the taxes of 1869, subsequently prosecuted, the defendant, among other defenses, pleaded payment, and that the court, in its findings, appropriated and applied nineteen thousand one hundred and forty-eight dollars and seventeen cents of the twenty-two thousand three hundred and fifty-five dollars paid, in consequence of the commissioners' order above quoted, to the payment of the taxes of 1869, and that that judgment remained in force.

Under these circumstances, the defendant asked the court to give the jury the following instructions: "10. If you believe that in the month of December, 1871, the board of commissioners of said Washoe County instructed and ordered the district attorney of said county, with the advice and consent of said district attorney, not to institute or commence any action against the defendants herein for the taxes, or any part thereof, sued for in this action, and that, in consideration of such order, and relying thereon, defendant paid to the county treasurer of said county a large sum of money, amounting to over twenty-two thousand dollars, upon agreement with said board and said district attorney that the taxes sued for should be settled thereby, and that no action should be instituted therefor, and that said order has never been revoked or set aside, then this action was illegally instituted, and your verdict should be for defendant.

"11. If in December, 1871, the board of commissioners duly made an order, instructing and ordering the district attorney of Washoe County not to institute an action for the taxes, nor any part thereof, for which this action is

brought, and that said order has never been revoked or set aside, then this action was illegally instituted, and cannot be maintained."

These instructions were refused, and such refusal and the exclusion of the order of the board are assigned as error. We think the rulings of the court were correct. The validity of the order of the Washoe commissioners was considered by this Court in the suit against the defendant for the taxes of 1869 (9 Nevada, 88), and it was held totally void, for the reason that the commissioners had no authority to make it. Under a law then in force, but since repealed, the district attorney was prohibited from commencing suits for taxes, except in those cases in which he was so directed by the board of commissioners, but neither he nor they had any authority to make any compromise or composition with delinquent taxpayers, or to release them from their liability to pay any part of the taxes they were legally bound to pay. If the defendant or its agents acted under a contrary belief, their ignorance of the law cannot be allowed to mend the case. The order being invalid should not have been admitted, and instructions assuming its validity were properly refused. And the defendant has suffered no injustice; for it appears that all the money paid by it has been allowed as a set-off against the amounts found due for its taxes for the years 1869 and 1870.

The next assignment of error is that the assessor increased the valuation of the road above that fixed by the managing agent in his sworn statement, without taking any additional testimony under oath, and that his act in so doing was void. Under the provisions of section 6 of the general revenue law, which is applicable to the assessment of all kinds of property, it is made the duty of the assessor to ascertain by diligent inquiry and examination all property in his county subject to taxation, *and to determine its true cash value.* For the purpose of enabling him to make the assessment, he is authorized and directed to demand sworn statements from the owners of property or their agents. Similar provisions, with regard to the assessment of the proceeds of the mines,

are contained in section 101, requiring owners and agents to state, not only the amount, but also *the value* of gold and silver bullion produced. These provisions were construed by this Court in the two cases, *State* v. *Kruttschnitt* and *State* v. *W. U. Telegraph Company* (4 Nevada, 207 and 344), and it was determined that they were intended for the benefit of the State, and not for that of the taxpayer; that the assessor was not obliged to demand any statement before making his assessment, and that he was not bound by it if he did demand and receive it. "It is to prevent property being concealed, and thereby escaping taxation. It is not for the purpose of enabling parties to fix a value on their own property. Where property is visible and open to inspection, the assessor should exercise his own judgment in the valuation, and not be governed by the opinion of the taxpayer." (4 Nevada, 345.)

The same interpretation was given to the provision for the assessment of the proceeds of the mines, which expressly requires the person making the statement to give the value as well as the amount of bullion. (4 Nev. 207.)

After this interpretation had been given to the law, on March 6, 1869, an act was passed supplementary to the revenue law, to apply to the case of railroads extending through two or more counties of the State, requiring the owner or managing agent to furnish to the assessor within a reasonable time after demand a statement under oath, "setting forth the length of said road in such county and the value thereof, with a list of the property, real and personal (except rolling-stock), pertaining thereto; also the whole length of road within this State, and the number and value of all locomotives and cars, commonly known as 'rolling-stock,' used on said road, within this State, an apportionment of the value of such rolling-stock to such county, the same to be estimated according to the proportion which the portion in said county bears to the whole length of said railroad within this State. The assessor receiving such statement may avail himself of other evidence under oath, and is hereby authorized for such purpose to administer oaths

relating to the matter of such assessment: *provided* reasonable notice of the time and place of the taking of such evidence shall be served upon the person making such statement, or on some officer or managing agent" of the owner.

It is argued, in view of these provisions, that the assessor had no right to increase the valuation of the road above that fixed in the sworn statement, without taking other testimony under oath after notice to the owner. [The testimony shows that the value fixed in the statement was six thousand dollars per mile, and the assessment fifteen thousand dollars per mile.] We do not concur in this view. The legislature which passed this act must be presumed to have known the provisions and the interpretation of the general revenue law. As they made no change in that law, they must have desired that it should stand with its existing construction. In other words, they must have intended that the assessor should exercise his judgment in valuing property generally, with or without the sworn statements of the owners, disregarding those statements in favor of the dictates of his own judgment, based upon his own knowledge, where it was proper to do so. If that was their intention with respect to property generally, it cannot be presumed, in the face of the constitutional inhibitions against special legislation, that they intended to make a special exception of railroads, unless they have plainly said so in language that will bear no other reasonable construction. The principal object of the act of 1869 is plainly apparent. It was to enable the assessors to obtain evidence in regard to property (rolling-stock) outside of their respective counties, and to provide a rule for the apportionment of the value of all the rolling-stock in the State among the different counties. To enable the assessor to do this, he is authorized to administer oaths, etc., after notice to the owner. But he is not bound to take additional testimony if he is satisfied as to the amount and character of the property; and he not only may, but ought to exercise his judgment, under the sanction of his official oath, in determining its value; and when he assesses a railroad at a higher rate

than that fixed in the sworn statement, without taking any additional testimony, it is to be presumed that he did so upon the basis of facts within his own knowledge, which he was not at liberty to disregard.

Finally, it is urged that the assessment was fraudulent. To sustain this defense testimony was introduced to show that the valuation was too high (on defendant's theory of valuation); that the assessor had suppressed the sworn statement furnished by the superintendent, and that he had used language during the time the assessment was being made showing malice and ill-will toward the corporation, and manifesting an intention to injure it. Rebutting testimony was introduced in direct contradiction of that produced by the defendant. It showed that the valuation of the road was rather under than over the just amount, and fully met that given on the other points. The issue was submitted to the jury and found against the defendant. We cannot disturb the finding.

Having fully reviewed all the assignments of error, and finding them without merit, the judgment and order overruling the motion for a new trial are affirmed.