### CRITTENDEN et al. v. DORN et al.

(Circuit Court of Appeals, Ninth Circuit. August 1, 1921.)

No. 3423.

1. **Records ⬩2, 18(2)—McEnerney Act held valid, and actions thereunder proceedings in rem.**
   The McEnerney Act of California, providing for the establishment and quieting of title to real property in case of the loss or destruction of public records, is valid, and actions thereby authorized are proceedings in rem.

2. **Records ⬩18(8)—Affidavit by plaintiff's president stating source of title held sufficient under statute.**
   In an action to establish title to land, the record of which had been destroyed by fire, an affidavit by plaintiff's president, stating the source of its title, its possession thereunder, that before purchasing the property, and before giving certain mortgages, it caused the title to be examined, and was informed that it had title in fee, that there were no subsisting mortgages, deeds of trust, or liens, except certain described mortgages, that it had never made any conveyance thereof, or of any interest therein, that it did not know and had never been informed of any person claiming any interest or lien, and that no notice of ownership or claim to the property had been filed, *held* to comply with the requirements of section 5 of the McEnerney Act of California.

3. **Records ⬩18(10)—Judgment held conclusive as to sufficiency of affidavit as to lost instruments on collateral attack.**
   The affidavit required by section 5 of the McEnerney Act of California, in actions thereunder to establish title to land, the record of which has been destroyed by fire, is not jurisdictional, and the judgment in favor of plaintiff is conclusive of the sufficiency of the affidavit, when collaterally attacked.

4. **Records ⬩18(10)—Judgment held conclusive against person not in being.**
   As actions under the McEnerney Act of California are *proceedings in rem*, and as section 11 expressly declares that the judgment shall be binding on every person, who at the time of the commencement of the action had or claimed any estate, right, etc., and every person claiming under him, the judgment in such an action was conclusive against one claiming an interest under a trust, though he was not in esse at the time of the entry of the judgment.

---

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Adverse possession ⊙⇒106(4)—Gives fee-simple title against persons against whom statute runs.**

Adverse possession under Civ. Code Cal. § 1007, and Code Civ. Proc. §§ 322, 323, vests the possessor with title in fee simple against all claimants against whom the statute runs.

**6. Limitation of actions ⊙⇒174(2)—Possession adverse to trustee bars those represented by him.**

Title by prescription, good against a trustee, was good against all persons represented by him, though they were minors during the period of prescription.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Suit by Lorraine de la Montanya Crittenden and others against Narcissus Augustus Dorn and others. From a decree dismissing the suit, plaintiffs appeal. Affirmed.

Frank R. Wehe, Carlo S. Morbio, and Bert Schlesinger, all of San Francisco, Cal., for appellants.

A. E. Cooley and Ralph H. Lachmund, both of San Francisco, Cal., for appellee Mysell-Rollins Bank Note Co.

H. W. Hutton, of San Francisco, Cal., for appellee Lilly Croome.

R. M. J. Armstrong and Donzel Stoney, both of San Francisco, Cal., for appellees German Savings & Loan Society and others.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The nature of this case is such that to an intelligent understanding of it a somewhat full statement of the facts and proceedings is essential. It grew out of a certain deed of trust, of date September 12, 1900, by James de la Montanya, of San Francisco, therein designated as trustor, by which he conveyed to D. S. Dorn, of the same city, in trust, certain specifically described real property, the first of which was a lot on Clay street in San Francisco, and being the property in contest between the parties to the present appeal; the second specifically described parcel, referred to as the outside lands, and being designated in the record as the Point Lobos property; and the third parcel being situate in Alameda county, and referred to in the record as the Oakland property.

The deed provided in effect in the first and second clauses thereof that the trustee should take possession of the property, collect the rents, issues, and profits thereof, and pay out of the income or its accumulations or conversions the expenses of the trust, costs of maintenance, rebuilding, or construction, and all expenses incidental to the trust, and by its third subdivision provided that, after making such payments and setting aside as much as he should consider necessary for any of the purposes authorized by the deed, the trustee should pay to the trustor the net income of the property or such part thereof as the latter might require and apply for during his life, "for the purpose of supporting said James de la Montanya, and for the maintenance and education of Lorraine de la Montanya, the minor daugh-

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ter, and Jacques de la Montanya, the minor son," of the trustor. The fourth paragraph is as follows:

"In case the said James de la Montanya shall die before Lorraine de la Montanya and Jacques de la Montanya, or both of them, or either of them, then the said party of the second part, trustee herein, and upon the happening of that event, shall thereafter pay so much of the said net income of the property hereinbefore described, or hereafter held by the trust hereby created, as he in his judgment shall deem necessary for the support and proper education of said Lorraine de la Montanya during her minority, and the said Jacques de la Montanya during his minority, or in case one of them is dead, to the survivor of them during such survivor's minority. As soon as Lorraine de la Montanya shall have attained her majority, in case she lives that long, then the said trustee shall pay one-half of the net income as herein defined thereafter accruing to the said Lorraine de la Montanya, and as soon as the said Jacques de la Montanya shall have attained his majority then the said trustee shall pay to the said Jacques de la Montanya one-half of the net income derived as herein defined thereafter accruing to the said Jacques de la Montanya. In case the said Lorraine de la Montanya or Jacques de la Montanya shall either of them die before arriving at the age of majority and without issue, then and in that case, when the survivor arrives at the age of majority, said trustee shall thereupon pay all of the net income as herein defined thereafter accruing to the said survivor. In case of the death of Lorraine de la Montanya after the death of James de la Montanya, leaving issue surviving her, then and in that case the income hereby directed to be paid to the said Lorraine de la Montanya, or such part thereof as the said trustee may deem necessary, shall be expended for the support, maintenance, and education of said issue during the minority of said issue, and as each of said issue attains his or her respective majority, the trustee shall pay to each of said issue such part of the income of said deceased parent as is equal to the quotient of the entire income of such parent divided by the number of such children, or, if there is but one child, the entire share of the income of such parent; but in case she so dies without issue, such income accruing after the said majority of said Jacques de la Montanya shall be payable to Jacques de la Montanya, if he is alive. In case of the death of Jacques de la Montanya after the death of James de la Montanya, leaving him issue surviving, then and in that case the income hereby directed to be paid to the said Jacques de la Montanya, or such part thereof as the said trustee may deem necessary, shall be expended for the support, maintenance, and education of said issue during the minority of said issue, and as each of said issue attains his or her respective majority the trustee shall pay to each of said issue such part of the income of said deceased parent as is equal to the quotient of the entire income of such parent divided by the number of such children, or if there is but one child the entire share of the income of such parent, but in case he so dies without issue such income accruing after the majority of said Lorraine de la Montanya shall be payable to Lorraine de la Montanya if she is alive. Upon the death of the survivor of Lorraine de la Montanya and Jacques de la Montanya, James de la Montanya being dead, then this trust shall therewith instantly terminate, and all of the property held under and by virtue of the trust hereby created, without any act or acts on the part of the trustee herein made, or any other person, shall immediately vest in fee simple, one-half in the heirs of the body of Lorraine de la Montanya, if she leaves any, and one-half in the heirs of the body of Jacques de la Montanya, if he leaves any; but if either of them shall die without issue, then in the heirs of the body of the other, and if both of them should die without issue, then the said property shall vest in equal proportions in the heirs at law of James de la Montanya, the father of the party of the first part herein."

The fifth pargraph declares the intent and purpose of the instrument to be to restrain the trustor and his two named children from

transferring or in any way disposing of any interest in the trust property, to the end that the trust "shall be irrevocable and not to be terminated, except on the happenings of the contingencies herein expressed." The ninth paragraph declares the trust property to be the separate property of the trustor, having been acquired by inheritance from his father, and such was also the evidence in the case.

After the execution of the deed of trust, the wife of the trustor (who subsequently became Mrs. Terbush, and as Lorraine Wright Terbush intervened in the present suit) executed to D. S. Dorn, the trustee named in the deed, and the beneficiaries of the trust, a deed quitclaiming any interest she might have in the trust property, which deed was put of record where the property is situated. At the time of the execution of that quitclaim deed a divorce suit was pending between her and her husband. It appears from the testimony of Mrs. Terbush that she, through her attorney in that suit, sought from her husband a property settlement in the sum of $100,000, but upon the suggestion of Mr. D. S. Dorn, and in consideration of the provision made in the trust deed for her children, she consented to accepted $24,000 instead.

The record shows that, Dorn having, on the 27th day of October, 1902, resigned his position as trustee under the deed, the trustor filed in the superior court of the city and county of San Francisco a petition for the appointment of William M. Madden to fill the vacancy in the trusteeship, which was so decreed by a judgment entered by Judge Carroll Cook, of that court, October 30, 1902, and by which it was—

"ordered, adjudged, and decreed that the said William M. Madden had the same powers and authority as trustee under said deed and declaration of trust as said D. S. Dorn had and exercised thereunder, and that D. S. Dorn execute and deliver to William M. Madden a good and sufficient deed and conveyance, conveying to him as such trustee the property in said deed and declaration of trust described."

On the same day, to wit, October 30, 1902, Dorn executed to Madden the deed so directed, which recited, among other things, the execution of the trust deed to himself and its record, his acceptance of the trust and subsequent resignation thereof, the proceeding in the superior court resulting in the appointment of Madden as trustee in his stead, Madden's acceptance of the appointment, and that in conformity with the decree of Judge Cook, "and for the purpose of carrying into effect the terms and conditions and objects set forth in said deed and declaration of trust," the party of the first part (Dorn) individually and as trustee granted the property to Wm. M. Madden, his successor and assigns. The deed was witnessed by Charles S. Heggerty, Madden's acceptance of the trust was indorsed thereon, and it was recorded in the recorder's office of both the city and county of San Francisco and Alameda county. Mr. Heggerty was, according to the record, the attorney for the trustor, requested Madden's appointment as trustee, and was a member of the law firm of Knight & Heggerty, which firm subsequently brought for the trustor a suit in the same court for the cancellation of the trust. The persons named as defendants in the latter suit were Sara Jane de la Montanya, who was

the grandmother of the two minors, Sara Jane de la Montanya Dorn, her daughter, William M. Madden as trustee, N. A. Dorn, who was the husband of Sara J. de la Montanya Dorn, and the two minors, Lorraine de la Montanya and Jacques de la Montanya.

The real ground upon which that suit was made to rest was the alleged fact that the said D. A. Dorn, who drew the deed of trust, inadvertently omitted from it a clause giving to the trustor the right to revoke and cancel the trust at any time; the purpose of the suit being to effect that object by means of a decree of the court based upon that alleged fact. And such was the decree of the court entered by Judge Hebbard on the 20th day of September, 1904. The record shows that the judgment roll in that suit was destroyed by the great fire that occurred in San Francisco in April of 1906, but that the decree in the suit was entered in the judgment book, which was not destroyed, from which record this recital of the pleadings and appearances in the suit appears upon its face:

"The above-entitled cause came on regularly for trial upon the calendar of the court upon the amended complaint of the plaintiff and the answers of the defendants; Messrs. Knight & Heggerty appearing and acting as the attorneys for the plaintiff, Messrs. Dorn, Savage & Dorn appearing and acting as the attorneys for the defendants N. A. Dorn, Sara Jane de la Montanya (widow), Sara Jane de la Montanya Dorn (her daughter), Lorraine de la Montanya and Jacques de la Montanya, minors, appearing herein by and through their general guardian, Sara Jane de la Montanya, by her attorneys, Messrs. Dorn, Savage & Dorn, and Wm. M. Madden, Esq., defendant, trustee, appearing in person."

The record shows that N. A. Dorn and D. S. Dorn were members of the firm of Dorn, Savage & Dorn. The decree recites upon its face the introduction of evidence in the case, and decrees that the trustor executed the deed with the intention and belief that the deed in express terms declared that the trust thereby created should exist only for a period "during which certain then threatened and thereafter commenced litigation between the plaintiff, James de la Montanya, and his wife, Lorraine Spencer de la Montanya, involving their marriage, divorce, and property rights, should be pending, and until such litigation would be finally determined," whereupon the trust would expire and the real property therein described should be reconveyed to him by the trustee, D. S. Dorn, upon the final determination of the litigation, and that it was the intention of the trustor, the complainant in the suit, to rescind the power and revoke the trust created by the deed, and that the power of revocation was omitted from the instrument by the mistake of the complainant and the mutual mistake of the parties to the deed of trust; that the instrument was executed by mistake, and did not truly express the intention of the parties thereto, and should be revised and reformed, so as to express their true intention; that the litigation between the complainant and his wife was finally terminated August 4, 1902, and that the purpose and object for which the trust was created had ceased to exist, and that the complainant did upon the final determination of the litigation exercise the power to revoke and did revoke the trust—the decree directing the defendant to the suit, William M. Madden, individually and as trustee under the

deed of trust, to execute to the complainant a good and sufficient conveyance of the property in question, which, according to the record, Madden did on the 15th day of February, 1905; the latter deed, which was recorded at Madden's request, reciting the making of the original trust deed of September 12, 1900, its record in San Francisco and Alameda counties, the decree of October 30, 1902, accepting the resignation of Dorn and appointing Madden trustee in his stead, the record of that decree, the execution of the deed from Dorn to Madden on October 30, 1902, its record in the counties in which the property was situated, the commencement of the suit in which the Hebbard judgment was entered September 20, 1904, and its record in the counties in which the property was situated.

James de la Montanya, the creator of the trust and owner of all of the property described in the deed, died June 17, 1912. Subsequently, to wit, February 3, 1914, his son, Jacques de la Montanya, commenced the present suit in the court below to obtain a decree restoring the trust upon the alleged ground that the Hebbard decree was procured by fraud. His sister, Lorraine de la Montanya, thereafter, with her husband, Crittenden, intervened in the suit, as did the minor son of the complainant, Jacques de la Montanya, through his guardian; that minor having been born August 12, 1912, and therefore subsequent to the transactions and decree complained of. The record shows that in the course of the proceedings in the court below the trust was by decree restored as to the Point Lobos and Alameda properties, but the litigation continued between the respective claimants as respects the Clay street property, and the present appeal is limited to that.

The record shows that that property was, subsequent to the Hebbard decree, sold by James de la Montanya for value to one Henderson, who subsequently, and on April 2, 1906, sold it to the present appellee for $150,000. It appears that prior to its purchase the appellee was in possession of the property as lessee of Henderson, and that prior to its purchase that company had the title to the property examined and that it was approved.

Almost immediately after the purchase, the great fire of 1906 destroyed the buildings that were upon the lot and almost all of the public records of the city and county of San Francisco. That great calamity was the cause of the enactment of what is known as the McEnerney Act of the Legislature of California, which statute, as well as the statute of limitations of the state, the court below concluded entitled the appellee, under the proofs in the case, to a dismissal of the suit, regardless of the question whether or not the Hebbard decree was obtained by fraud. After a very careful examination of the record, and of the elaborate and able briefs of counsel, we are of the same opinion.

The McEnerney Act was passed at a special session of the Legislature of California, called (at least in part) to meet the necessity of restoring the record title to lands in San Francisco. It is entitled "An act to provide for the establishment and quieting of title to real property in case of the loss or destruction of public records," and its first and second sections are as follows:

"Section 1. Whenever the public records in the office of a county recorder have been, or shall hereafter be, lost or destroyed, in whole or in any material part, by flood, fire or earthquake, any person who claims an estate of inheritance, or for life in, and who is by himself or his tenant, or other person, holding under him, in the actual and peaceable possession of any real property in such county, may bring and maintain an action in rem against all the world, in the superior court for the county in which such real property is situate, to establish his title to such property and to determine all adverse claims thereto. Any number of separate parcels of land claimed by the plaintiff may be included in the same action.

"Sec. 2. The action shall be commenced by the filing of a verified complaint, in which the party so commencing the same shall be named as plaintiff, and the defendants shall be described as 'all persons claiming any interest in, or lien upon the real property herein described, or any part thereof,' and shall contain a statement of the facts enumerated in section one of this act, a particular description of such real property, and a specification of the estate, title, or interest of the plaintiff therein."

St. 1906, p. 78.

Subsequent sections provide for the issuance and publication of summons; the required period of publication being at least once a week for two months. As the sufficiency of the affidavit required by the act to be filed at the time of the filing of the complaint is questioned by the appellants, we insert also the provision of the statute concerning its requirements:

"Sec. 5. At the time of filing the complaint, the plaintiff shall file with the same his affidavit, fully and explicitly setting forth and showing (1) the character of his estate, right, title, interest or claim in, and possession of the property, during what period the same has existed and from whom obtained; (2) whether or not he has ever made any conveyance of the property, or any part thereof, or any interest therein, and, if so, when and to whom; also a statement of any and all subsisting mortgages, deeds of trust, and other liens thereon; (3) that he does not know and has never been informed of any other person who claims or who may claim, any interest in, or lien upon, the property or any part thereof, adversely to him, or, if he does know or has been informed of any such person, then the name and address of such person. If the plaintiff is unable to state any one or more of the matters herein required, he shall set forth and show, fully and explicitly, the reasons for such inability. Such affidavit shall constitute a part of the judgment roll. If the plaintiff be a corporation, the affidavit shall be made by an officer thereof. If the plaintiff be a person under guardianship the affidavit shall be made by his guardian."

The record shows that such an action was brought by the Mysell-Rollins Bank Note Company in the superior court of the city and county of San Francisco against all persons claiming any interest in or any lien upon the property here in question, and against all the world, to establish its title to the said property, and that on October 16, 1908, a decree was entered therein so establishing it.

[1] That the McEnerney Act is a valid enactment, and that actions thereby authorized are proceedings in rem, has been distinctly adjudged by the Supreme Court of the United States, by this court, and by the Supreme Court of California. American Land Co. v. Zeiss, 219 U. S. 47, 31 Sup. Ct. 200, 55 L. Ed. 82; American Land Co. v. Zeiss, 191 Fed. 125, 111 C. C. A. 605; Berton v. All Persons, etc., 176 Cal. 610, 616, 170 Pac. 151; Soher v. Cabaniss, 161 Cal. 548, 549, 119 Pac. 911; Dowling v. Spring Valley Water Co., 174 Cal. 218, 162 Pac. 894. See,

also, Title & Document Restoration Co. v. Kerrigan, 150 Cal. 289, 88 Pac. 356, 8 L. R. A. (N. S.) 682, 119 Am. St. Rep. 199; Robinson v. Kerrigan, 151 Cal. 40, 90 Pac. 129, 121 Am. St. Rep. 90, 12 Ann. Cas. 829.

[2] The objection urged by the appellants to the affidavit filed in the action brought by the Mysell-Rollins Bank Note Company we think not well taken. The statutory requirements regarding that matter have already been set out. Mysell's affidavit states in substance that he was at the time president of the bank note company and had knowledge of all the facts, and made the affidavit for and on its behalf; that the plaintiff claimed to be and was the sole owner in fee, and was in the actual and peaceable possession of the property, which the affidavit specifically described; that the plaintiff acquired the fee-simple title thereto April 2, 1906, under the name of the Mysell-Rollins Company, from James W. Henderson and his wife, Amelia J. Henderson, and their son, George Y. Henderson, by deed of that date, which deed was recorded April 5, 1906, in Book 2 of Deeds, page 29, in the office of the recorder of the city and county of San Francisco, Cal., under which deed the plaintiff took actual, peaceable, and exclusive possession of the property, which title and possession the plaintiff had ever since held; that at the time the plaintiff obtained title and possession of the lot the latter had upon it a four-story brick building, all of which was occupied at the time of the plaintiff's purchase by the grantors of the plaintiff by and through their tenants; that at the time the plaintiff obtained title to and possession of the property the said tenants of the said grantors attorned to the plaintiff and recognized it as the owner of the property and of every part thereof; that thereafter the said property was occupied by the plaintiff and its tenants, who paid rent to it and recognized it as such owner down to the 18th day of April, 1906, at which time the building was entirely destroyed by fire; that in the month of June, 1906, the plaintiff caused to be erected on the lot a one-story frame building, which frame building had ever since been occupied by the plaintiff and its tenants, who recognized the plaintiff as the owner of the property, and who paid rent therefor to the plaintiff; that at the time of the plaintiff's purchase it caused the title to the property to be examined by Messrs. Sooy & Dorn, attorneys at law, who thereafter informed the plaintiff that its deed conveyed the absolute fee-simple title to the property; that the plaintiff claimed to be and was the sole owner in fee of the property and in the actual, open, peaceable, and exclusive possession thereof, and had been ever since April 2, 1906, never having made any conveyance thereof or of any interest therein; that there was no subsisting mortgage, deed of trust, or other lien on the property or any part thereof, except the lien of taxes for the fiscal year commencing July 1, 1907, and except the lien of a certain mortgage made by the Mysell-Rollins Company, then the Mysell-Rollins Bank Note Company, to the Hibernia Savings & Loan Society, dated April 2, 1906, and recorded April 5, 1906, in Book 2 of Mortgages, page 71, in the office of the recorder of the city and county of San Francisco, which mortgage was executed by the plaintiff to that bank as security for the payment of the plaintiff's promissory note of even date in the sum of $100,000,

with interest as specified in the note, and except a mortgage made by the Mysell-Rollins Company, then the Mysell-Rollins Bank Note Company, to the same bank, dated November 9, 1906, and recorded November 13, 1906, in Book 17 of Mortgages, page 188, in the same recorder's office which last-mentioned mortgage was executed as security for the payment of the plaintiff's promissory note in the sum of $5,000, and except a deed of trust made by the Mysell-Rollins Company, then the Mysell-Rollins Bank Note·Company, by W. C. Mysell, president, to the American National Bank, dated April 5, 1906, and recorded January 21, 1907, in Book 51 of Deeds, page 71, in the office of the same recorder, which deed of trust was executed to secure the payment of a promissory note made by the same plaintiff to the American National Bank in the sum of $20,000; that the plaintiff did not know and never has been informed of any other person who claims or who might claim any interest in or lien upon any portion of the said property adversely to the plaintiff, except the two banks mentioned, the only interest of which banks in the said property being that above specified, the address of each of said banks being also stated in the affidavit; that immediately before the execution of the said deed of trust to the American National Bank, the plaintiff caused all papers and proceedings recorded in the public offices of the city and county of San Francisco affecting the plaintiff's title to the said property to be examined by counsel learned in the law, who reported to the plaintiff that it was the sole owner in fee of the said property free and clear of all incumbrances except the lien of the said mortgages to the Hibernia Savings & Loan Society; that immediately before the commencement of the action the plaintiff caused the records of the said city and county to be examined by the City Abstract Company, a corporation engaged in the business of·searching records in the said city and county of San Francisco, for the purpose of ascertaining whether any papers had been placed of record, or any proceedings had been commenced affecting the plaintiff's title, since the time when such title had been examined immediately prior to the execution of the said deed of trust, which abstract company reported that since that date no papers had been recorded and no proceeding commenced affecting said title; that there were no incumbrances or liens on the said property except the lien of the said mortgages to the Hibernia Savings & Loan Society and the said deed of trust to the American National Bank; that no notice of ownership or claim to the said property or any part thereof had been filed by any person under the act of the Legislature of California approved March 23, 1907.

[3] It is sufficiently obvious, we think, without going into specific details, that the affidavit made in support of the action brought by the appellee under the McEnerney Act fully complied with the requirements of section 5 of that act. To which may be added as a further answer to the objection made to the sufficiency of the affidavit, that the judgment in favor of the plaintiff in the action brought by the Mysell Company to establish its title to the property, when collaterally attacked, as is the case here, is conclusive—the affidavit not being jurisdictional. See American Land Co. v. Zeiss, 191 Fed. 125, 130, 111 C. C. A. 605.

[4] It is urged that the decree based upon the McEnerney Act could not affect the intervener Jacques de la Montanya, for the reason that he was not then in esse, having been born subsequent to its entry. Section 11 of that act declares:

"The judgment shall ascertain and determine all estates, rights, titles, interests and claims in and to said property and every part thereof, whether the same be legal or equitable, present or future, vested or contingent, or whether the same consists of mortgages or liens of any description and shall be binding and conclusive upon every person who, at the time of the commencement of the action, had or claimed any estate, right, title, or interest in or to said property, or any part thereof, and upon every person claiming under him by title subsequent to the commencement of the action."

In Robinson v. Kerrigan, 151 Cal. 40, 90 Pac. 129, 121 Am. St. Rep. 90, 12 Ann. Cas. 829, the Supreme Court of the state had under consideration the question of the validity of the "Torrens Law" (St. Cal. 1897, p. 138), purporting to establish a system for the registration of title to lands. In describing that law the court said:

"As a foundation for the system, it is necessary to have the title established. To that end a proceeding is authorized whereby such title may be settled and declared by a decree of the superior court. The title thus established is to be certified by the county recorder, and the certificate is made conclusive evidence of title in the person therein named as the owner."

And the court declared the proceeding to be "in all important particulars of similar character to that provided by the act of 1906, known as the 'McEnerney Act.' St. 1906, p. 78." In sustaining the validity of the Torrens Law the court said (151 Cal. 46, 90 Pac. 131 [121 Am. St. Rep. 90, 12 Ann. Cas. 829]):

"The state has full control over the subject of the mode of transferring and establishing titles to property within its limits. For these purposes the state has power to provide a special proceeding, in the nature of a proceeding in rem, to fix the status of the land and declare the nature of the titles and interests therein and the person or persons in whom such titles and interests are at the time vested. It may do this whenever it may be considered necessary or likely to promote the general welfare"—citing Arndt v. Griggs, 134 U. S. 324, 10 Sup. Ct. 557, 33 L. Ed. 918; People v. Simon, 176 Ill. 165, 52 N. E. 910, 44 L. R. A. 801, 68 Am. St. Rep. 175; Hamilton v. Brown, 161 U. S. 256, 16 Sup. Ct. 585, 40 L. Ed. 691.

The same court having adjudged the proceeding authorized by the McEnerney Act to be a proceeding in rem, as have the federal courts, and that statute itself expressly declaring that a judgment entered in such a proceeding "shall be binding and conclusive upon every person who at the time of the commencement of the action had or claimed any estate, right, title, or interest in or to said property, or any part thereof, and upon every person claiming under him by title subsequent to the commencement of the action," we do not see how it can be properly held that the intervener Jacques de la Montanya, claiming as he does under parties to that action then living, is not bound by the decree.

In a case entitled Estate of Daughaday, 168 Cal. 61, 72, 141 Pac. 929, 933, that court thus declared the effect of such a decree as we have here:

"It was shown in this case, as above pointed out, that contestant established title to herself in this very land by a decree in an action which she brought under the McEnerney Act. Stats. 1906 (Ex. Sess.) p. 78. That decree has become final and is as binding upon the Daughaday beneficiaries as upon all the rest of the world. It does not appear, and it matters not, whether that decree was based wholly or not at all upon the evidence of the decree of distribution in the estate of Timothy Guy Phelps. If it were obtained wholly upon the evidence afforded by that decree of distribution, and if that distribution itself had been secured by fraud, nevertheless it would amount to nothing more than the introduction of fraudulent evidence in the trial of a cause, which fact would not militate in the slightest against the validity of the decree, nor be a ground for setting it aside. Bell v. Thompson, 147 Cal. 689, 82 Pac. 327."

And Chief Justice Beatty, when upon the supreme bench of Nevada and speaking for that court in the case of State of Nevada v. C. P. R. Co., 10 Nev. 47, 80, said:

"A judgment in rem is an adjudication pronounced upon the status of some particular subject-matter by a tribunal having competent authority for that purpose. It differs from a judgment in personam in this: That the latter judgment is, in form as well as substance, between the parties claiming the right; that it is so inter partes appears by the record itself. It is binding upon the parties appearing to be such by the record, and those claiming under or by them. A judgment in rem is founded on a proceeding, not as against the person as such, but against the thing or subject-matter itself, whose state or condition is to be determined. It is a proceeding to determine the state or condition of a thing itself, and the judgment is a solemn declaration upon the status of the thing, and it ipso facto renders it what it declares it to be."

A case much in point in principle is that of McArthur v. Allen (C. C.) 3 Fed. 313, growing out of the will of Gov. McArthur, by which certain lands of the testator were devised to the executors of the will for the time being, with directions to collect and apply the rents as provided in the will, until his children shall all be dead and the youngest grandchild should have attained the age of 21 years; the lands to be thereupon conveyed to his then living grandchildren in equal shares per capita, but if any grandchild should have died leaving children the share of such grandchild was to go to his or her children per stirpes—the final provision of the will on that subject being:

"And in such final distribution of my lands it is my direction that deeds of partition shall be made to and in the name of those who shall be thus entitled thereto, and in the name and for the use of no other person whatsoever, *which deeds shall be executed by my executors for the time being;* and to enable my executors the more effectually to execute the powers and duties by this will devolved upon them, and to protect my said children and grandchildren against fraud and imposition, *I hereby devise* to my said executors, and the successors of them, all my said lands so directed to be leased and finally divided as above, *and to their heirs,* in trust, for the uses and purposes and objects expressed in this my will, and the performance of which is herein above directed and prescribed, to have and to hold the title thereof till such final division and partition thereof, and no longer."

One of the sons of the testator, named Allen C. McArthur, contested the will on the ground that the testator lacked the requisite testamentary capacity, and after a trial the jury found against the will and the court entered a decree accordingly. Years afterward the children of Allen C. McArthur (who was the complainant in the bill to set the will aside), and all of whom were born after the will was set aside, filed a bill

alleging that the complainant, Allen C. McArthur, in the bill so filed, was the last born of the grandchildren, and that he arrived at the age of 21 on the 4th day of March, 1875, and that the children of the testator were all dead; that upon the death of the testator his children ignored the will and the rights of the grandchildren under it, and proceeded to appropriate to themselves all the lands in question by a proceeding in partition in a certain named court—the prayer of the bill being that the defendants thereto be required to account for the rents and profits of the lands, that it be decreed that they held their respective titles in trust for the grand and great-grand children of the testator according to the provisions of the will, and that partition be made among those parties according to their several rights and for general relief. The defendants relied upon the validity of the proceeding regarding the will, and also set up that they were bona fide purchasers without notice of any infirmity in that proceeding. One of the two objections made by the complainants to the record of the will case was that it could not affect after-born grandchildren; and it is upon that point that the decision of the learned judge is, in our opinion, particularly applicable in principle to the contention that the after-born intervener in the present case could not be bound by the decree under the McEnerney Act establishing the title to the property.

The statute under which the McArthur will was set aside was as follows:

"That if any person interested shall, within two years after probate had, appear, and, by bill in chancery, contest the validity of the will, an issue shall be made up, whether the writing produced be the last will of the testator or testatrix or not, which shall be tried by a jury, whose verdict shall be final between the parties, saving to the court the power of granting a new trial, as in other cases; but if no person appear in that time the probate shall be forever binding; saving also to infants, married women, and persons absent from the state, or of insane mind, or in captivity, the like period after the removing of their respective disabilities." 3 Chase's St. 1788.

The court said:

"The requirement that the proceeding shall be instituted 'within two years after probate had' is imperative and unqualified, except by the savings specified. It is also declared that the verdict 'shall be final between the parties,' subject to the limitations expressed, which have no application here. It is clearly implied that those not then in esse, and who hence cannot be parties, are barred and concluded as effectually as those who are living. What is expressed and what is implied in a statute are alike parts of it. U. S. v. Babbit, 1 Black, 55–61.

"There is no saving as to after-born children, and we cannot recognize their right to interfere, as they are seeking to do in this case, without interpolating into the statute what it does not contain. If the result be not as we have suggested, cases may be readily imagined where there might be successive births through many years, and each child when born would have a right to renew the litigation touching the validity of the decree annulling a will. This would be an intolerable evil. It cannot be supposed the Legislature intended such a solecism. In this case, according to the theory of the bill, the right of the youngest complainant accrued more than 35 years after the will was set aside. Such a construction of the statute would open Pandora's box, without a single good amid the thronging evils that would some forth from it.

" 'There are, strictly speaking, no parties' in such cases. Runyon v. Price, 15 Ohio St. 1–6. Every one interested, if he choose to do so, may make him-

self a party to the record. Nothing is no question but the legal status of the will. That instrument is the res of the controversy, and in the absence of fraud all persons concerned, whether formally before the court as parties or not, are necessarily alike concluded by the verdict. Substantially this is a proceeding in rem, and the court cannot take jurisdiction of the subject-matter by fractions. The will is indivisible, and the verdict of a jury establishes it as a whole or wholly sets it aside. To save the right of action to one is, therefore, necessarily to save it to all. The case belongs to that class of actions where the law is compelled either to hold the rights of all parties to be saved or all to be barred.' Bradford v. Andrews, 20 Ohio St. 203–219.

"The judgment of the probate court touching a will is, until reversed, conclusive upon all collateral issues. Brown v. Burdick, 25 Ohio St. 260–266. 'The rights of necessity form a part of our law.' Respublica v. Sparhawk, 1 Dall. 383. That those who are formal parties and those who are not are alike bound by the decree is conclusively shown by the well-considered cases of Singleton v. Singleton, 8 B. Monroe, 340; Hunt v. Acre, 28 Ala. 580; Scott v. Calvit, 3 How. (Miss.) 148; Jacobs v. Pulliam, 3 J. J. Marshall, 200; Hodges v. Bauchman, 8 Yerg. 186; Wells' Will, 5 Littell, 273. These references are sufficient for the purposes of this opinion.

"It is a settled rule of law that where there are contingent limitations and executory devises to persons not in being, a suit may proceed against those in being holding the prior estate, and that a judgment or decree against the latter binds the former in all respects as if they were in esse and parties to the suit. Especially is this so when the former are before the court by representation—that is, where the rights and interests which those not in esse would have if then in esse are the same with those of parties in being and before the court. Gifford v. Hort, 1 Sch. & Lef. 408; Story's Eq. Pl. §§ 145, 792; Mead v. Mitchell, 17 N. Y. 210; Baylor's Lessee v. Dejarnette, 13 Grat. 152; Falkner v. Davis, 18 Grat. 651; Powell v. Wright, 7 Beav. 444–449; Lorrillard v. Costar, 5 Paige, 172; Palmer v. Flower, 1 Moaks, 664; Bossuet v. Moxon, 13 Moaks, 716; Wills v. Slade, 6 Vesey, 498; Lloyd v. Johns, 9 Vesey, 37–52.

"The rule springs from necessity. It involves the welfare of society, and rests on a solid foundation of reason and justice. If it were otherwise the long delay attending the settlement of rights of property in such cases would always be attended with inconvenience, and, not unfrequently, would bring in its train ruinous consequences."

[5] Respecting title by prescription, which was also pleaded by the defendants to the suit by setting up the exclusive and adverse possession of the property by the Mysell Company under the deed from Henderson from the time of its execution, and the payment of all taxes thereon, it is well settled that such adverse possession under section 1007 of the Civil Code, and sections 322 and 323 of the Code of Civil Procedure of California, vests such possessor with a title in fee simple against all claimants against whom the statute runs. Owsley v. Matson, 156 Cal. 401, 104 Pac. 983; Baker v. Clark, 128 Cal. 181, 60 Pac. 677; Woodward v. Faris, 109 Cal. 12, 41 Pac. 781.

[6] It is insisted, however, that the statute did not run against the complainant Jacques de la Montanya or his intervener son, on account of their minority. The answer to the contention is that, conceding that the trust was not annulled by the Hebbard decree, the title by prescription was undoubtedly good against the trustee, and therefore, in our opinion, good against all persons represented by him. In the case of Meeks v. Olpherts, 100 U. S. 564, 569 (25 L. Ed. 735), the Supreme Court, speaking through Mr. Justice Miller, in holding that, where by

the law of California an action is barred against the administrator of the estate of a deceased person, it bars all the heirs of the decedent, said:

"Whatever doubt may have existed at one time on the subject, there remains none at the present of that, whenever the right of action in the trustees is barred by he statute of limitations, the right of cestui que trust thus represented is also barred. This doctrine is clearly stated in Hill on Trustees, 267, 103, 504, and the authorities there cited fully sustain the text, both English and American. Among those especially applicable to this case are Smilie v. Biffle, 2 Pa. St. 52; Couch's Heir v. Couch's Administrator, 9 B. Mon. (Ky.) 160; Rosson v. Anderson, ... 43; Darnall v. Adams, 13 B. Mon. (Ky.) 273.

"In the first of these cases, land was devised to executors, with a power of sale, which was imperfectly executed by one of the executors alone. The legatee brought suit against the purchaser, and was held to be barred by the statute of limitations. After referring to the old opinion, and expressing surprise that it should ever have been entertained, and showing how it was overruled by Lord Hardwicke in Lewellen v. Mackworth, 2 Eq. Cas. Abr. 579, the court says: 'Therefore, where cestui que trust and trustees are both out of possession, for the time limited, the party in possession has a good title against both. By the terms of the will, the trustee had the right to enter on the land, to take the rents, issues, and profits, and apply the same to the separate use of Jane Craig, the testator's daughter, during her natural life with power to sell the fee simple and appropriate the interest of the purchase money to her use and after her death to be paid to certain legatees, of whom the present plaintiff was one. The property was sold in the lifetime of Jane Craig; but the sale was the act of but one of the trustees, and it is contended that the execution of the joint trust must be the act of all. In this respect, the title of Nicholson, the purchaser, is manifestly defective. But Nicholson took possession of the premises in pursuance of the contract, and held the same for upwards of 21 years. He, therefore, held adversely to both cestui que trust and trustee, and consequently obtained by the statute of limitations an indefeasible title, which cannot now be disturbed or gainsaid.'

"In the case of Rosson v. Anderson, supra, the question related to the title of slaves conveyed by a father to a trustee for his daughters. The trustee did not accept the trust, nor were the slaves ever delivered by the donor. One of the granddaughters, after her father's death, which occurred while she was a minor, brought suit for the slaves, and was met by a plea of the statute of limitations, to which she replied her infancy. The court held that the right of action, on the death of her father, vested in his executors, and, as more than five years had elapsed after they had qualified as such, the statute was a bar against them, and as they would have been barred by the statute, so was the heir, though a minor when the cause of action accrued.

"In Darnall v. Adams, supra, which concerned a devise of slaves, the same court held that the disability of coverture in the devisee could not prevent the running of the statute of limitations in favor of an adverse possession against the executor, and that it was well settled that the claim of the devisee is, under such circumstances, barred by the lapse of time which bars the executor. Coleman v. Walker, 3 Metc. (Ky.) 65, and Edwards v. Woolfolk's Administrator, 17 B. Mon. (Ky.) 376, are cases which assert the same doctrine, and in the latter the principle is fully and ably discussed and its soundness well maintained.

"A very strong case of the same character is that of Croxall v. Sherrard, 5 Wall. 268, where a remainderman was held barred by the statute of limitations of New Jersey, on account of the number of years of possession of defendant under purchase from the holder of the estate for life, all of which had elapsed during that life. This was held to be a bar, though the remainderman brought suit immediately on the death of his ancestor. This was, however, based on the peculiar wording of that statute.

"In Cunningham v. Ashley, 45 Cal. 485, it was held that an administrator, who is a party to a suit which involves the title of his intestate to real es-

tate, represents the title which I ___ and had at the time of his·death, and the judgment in such action concludes the adverse party and the· heirs of the intestate. And such judgment is an estoppel as to the title set up in the action."

See, also, Patchett v. Pacific Coast Railway Co., 100 Cal. 505, 35 Pac. 73; Watkins v. Specht, 47 Tenn. (7 Cold) 585; Herndon v. Pratt, 59 N. C. 327; 25 Cyc. 1010; 2 Corpus Juris, 226.

The decree is affirmed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 256 U. S. —-. 42 Sup. Ct. 50, 65 L. Ed. —-.